Alex CLARK, John T. Magee and Robert Turner, Plaintiffs,

v.

AMERICAN MARINE CORPORATION, a Louisiana corporation, Defendants.

Civ. A. No. 16315.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 15, 1969.

Franklin E. White, New York City, for plaintiffs.

Lolis E. Elie, New Orleans, La., for plaintiffs.

A. M. Trudeau, Jr., New Orleans, La., for plaintiffs.

Richard C. Keenan, New Orleans, La., for defendants.

RUBIN, District Judge:

This class action is brought by three individuals who allege that they were discharged in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1870, 42 U.S.C. § 1981. They seek both personal redress for themselves and class relief for the other Negroes who allegedly have suffered discrimination in employment at the hands of the defendant.[1] In separate findings of fact, the court has found that the evidence shows a pattern of discrimination by the defendant against Negroes in hiring and in opportunities for promotion. Since the employer is clearly subject to the Equal Employment Opportunity requirements of the 1964 Civil Rights Act,[2] we turn to a discussion of the other findings and conclusions. The issues with respect to the rights of the individual plaintiffs are dealt with separately.

## I. FACT FINDINGS WITH RESPECT TO THE INDIVIDUAL PLAINTIFFS

### A. *Robert Turner and John T. Magee*

The testimony of Robert Turner and John T. Magee was credible, consistent and uncontradicted. Turner was hired in 1957. Magee was employed intermittently from 1959 on. Both were laid off on February 5, 1965. Classified initially as laborers, Turner and Magee were assigned to work in the carpentry shop. By February 1965, after Turner had worked in the carpentry shop about four years and Magee about two and one-half years, both of them were transferred from the carpentry shop to the "yard" to do general labor. Shortly thereafter they were discharged.

They were replaced in the carpentry shop by two white men who had just been hired. On August 17, 1965, after the effective date of Title VII of the 1964 Civil Rights Act,[3] they applied for re-employment but were told the company was not doing any hiring.

---

1. In Clark v. American Marine Corp., E.D. La.1969, 297 F.Supp. 1305, 1306, the class was defined as "other Negroes, who (1) may previously have been discharged on account of race; or (2) are presently employed or (3) who may subsequently be employed by the defendant."

2. 42 U.S.C. § 2000e to 2000e–15.

3. The effective date of the Sections of Title VII pertinent to the present case was July 2, 1965. See subsections (a) and (b) of Section 716 of Pub.L. 88–352.

The company did not attempt to offer any explanation for the discharge of Turner and Magee. Charles White, the company's General Superintendent, testified that Turner and Magee were moved from the carpentry shop to the "yard"; he did not personally know whether or not white employees replaced them, but, if so, it was "without his knowledge" and he was "not going to condone it."

The evidence is persuasive that Turner and Magee were replaced in the carpentry shop because of their race, and that this replacement resulted in their discharge shortly thereafter. This however occurred before the effective date of Title VII, July 2, 1965, although the refusal to re-employ them came after Title VII had become applicable. Their rights will be discussed below after a consideration of the scope of Title VII.

### B. *Alex Clark*

By contrast with the evidence concerning the other individual plaintiffs, Alex Clark's testimony was uncorroborated, unconvincing, and denied by other credible witnesses. He testified that one day in August, 1965, his supervisor, Lawrence Rouse, told him to get a shovel and clean off "the barge on the dock." There were two barges on the dock, he said, and one was an oil barge. So he assumed he was to shovel shells off the other, which was a shell barge. He began doing so. Later Rouse returned, called him a "black stupid son of a bitch" for working on the wrong barge and, after the ensuing conversation, took him to the personnel manager who fired him. He testified he protested his discharge to the company's president (Durant), but his request for re-employment went unheeded.

Rouse, on the other hand, testified there was no oil barge at the dock. There were two barges, one carrying limestone and the other loaded with shell. He sent Clark to shovel shell, but found him shoveling limestone instead. Rouse told Clark that he was on the wrong barge. Clark then protested because Rouse was always moving him around, an argument ensued, and Clark demanded his pay check. Durant denied that Clark had ever spoken to him.

At the conclusion of the trial, when the impressions formed from the testimony and demeanor of the witnesses were fresh, the court observed, "[M]y present impression is Mr. Clark has not borne the burden of proof in his individual case." That conclusion has not been altered, and Clark's individual claim will be denied.

## II. THE CLASS ACTION

### A. *Fact Findings* [4]

 The defendant stresses certain factual aspects of the case well supported by the evidence: it desegregated such facilities as wash rooms and rest rooms before or contemporaneously with the passage of the Civil Rights Act; it has not been shown to have refused initial employment to any qualified Negro because of race; it has not been shown to have refused to promote any qualified Negro or to have denied employment to any skilled Negro.

But serious discrimination against Negroes nonetheless exists. It is subtle but not unwitting. Three employment practices with discriminatory effects are deliberately pursued.

#### 1. *Racial Discrimination in Initial Classification*

Upon hiring, unskilled Negroes are generally classified as laborers and whites are classified as helpers. Two "lines" of progression are formed in the company's unskilled ranks, each leading in a different direction. Laborers progress only to sandblasting, hooking, and painting. Whites, on the other hand, hired as "helpers", are assigned to assist semi-skilled and skilled em-

---

**4.** Additional facts are set forth in a separate Findings of Fact.

ployees. They are paid the same wage as laborers, but they are afforded the opportunity to learn better paying, more interesting jobs. The company generally fills its craft positions from within its own ranks, and only helpers acquire the skills to advance to these jobs.

"Even if this be so," the defendant contends, "there is no way of knowing the extent to which Negro employees would have advanced. * * * Certainly every Negro helper would not have advanced to top grade." That is obvious. But the discrimination lies in barring the way to all Negroes: those who could have advanced and those who could not. Not all white employees reach the top of the industrial ladder; but each has a chance to do so on his individual merit, without racial discrimination, and also without competition from his black fellow workers.

### 2. Hiring Practices

Hiring is "at the gate"; no advertisements or public announcements are made when jobs become available. The word of mouth message that vacancies exist in better paying jobs therefore usually goes only to whites. See Lea v. Cone Mills, N.D.N.C.1969, 301 F. Supp. 97, holding similar practices discriminatory.

### 3. Instructional Opportunities

Finally, only whites were offered company sponsored instruction in tacking, a semi-skilled position, roughly equivalent to third-grade welding, that presents an excellent opportunity to learn skilled jobs such as welding. One of the white senior welders instructed white employees in tacking during their lunch hour, with company encouragement, using company equipment and supplies. He was paid for time thus spent, but taught no Negroes.[5]

While there is no affirmative evidence that any Negro requested admission to

the class and was refused, the evidence points irresistibly to the conclusion that racial exclusion was intentional. The instructor taught whom he chose. He chose only white employees. All tackers and welders in the company's employ were white. Negroes working at a plant that had so clearly demonstrated a racial bar to the classification of Negroes could not be expected to jeopardize their jobs by seeking to cross the barrier so evident to them.

### B. Class Relief

Title VII of the 1964 Civil Rights Act was a recognition by Congress of widespread racial discrimination in employment that might affect any or all of the twenty-odd million Negroes in these United States, and an attempt to provide a remedy. See Hearings on S. 773 and S. 1937 Before the Subcomm. on Employment and Manpower of the Senate Comm. on Labor and Welfare, 88th Cong., 1st Sess., pp. 2–3; 72–74 (1963).

Here we have a clear demonstration of the condition that the Act was designed to eliminate. The defendant has pursued policies that discriminate against Negroes in initial hiring as well as in opportunity for advancement.

Title VII, 42 U.S.C. § 2000e–2, declares:

"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive

---

5. The instructor later did teach one Negro employee to tack at the request of his superintendent. This action was taken only after the Negro worker, a long time employee, had been told by the welder foreman that Negroes were not permitted to weld or tack, and had then made a special request for tacking.

any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

The company's conduct violates both subparagraphs. Its actions have not even been veiled with a gauze of objectivity by employment tests or other standards. Its employment policies have violated not only the express statutory language of the Act and the congressional policy embodied in it, but the truth, proclaimed to be self-evident by those who declared America's independence, that "all men are created equal."

■ No working man should be deprived of the right to earn his industrial way on free and equal terms. In Judge Gewin's words, "The ethic which permeates the American dream is that a person may advance as far as his talents and his merit will carry him." Miller v. International Paper Co., 5 Cir. 1969, 408 F.2d 283, 294.

Under Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), the court is authorized to enjoin any unlawful employment practice that defendant "has intentionally engaged in or is intentionally engaging in," and it may "order such affirmative action as may be appropriate * * *."

■■ There is no doubt that the defendant's actions were knowingly and voluntarily done and that its conduct was "intentional" within the meaning of the Act. The Act does not require that the defendant specifically intend to discriminate against Negroes. United States by Clark v. H. K. Porter Co., N.D.Ala.1968, 296 F.Supp. 40, 115. Cf. Dobbins v. Local 212, International Brotherhood of Electrical Workers, S.D. Ohio 1968, 292 F.Supp. 413, 443. However, should it be material, the conclusion that the conduct was deliberately intended to discriminate against Negroes is, on the present record, irresistible.

The plaintiffs are clearly entitled to an injunction against discriminatory practices in hiring. The company will be enjoined from classifying employees as "helpers" or as "laborers" by reference to race or in any other manner that violates Title VII. The company will also be enjoined from discriminatory practices in hiring skilled workers.

But such relief will not remedy the conditions that the company's past practices have wrought. Negroes presently employed, who were initially assigned as laborers and whose progress thereafter has been stymied, are entitled to relief as well. They are not aided by an order directing the company to cease discriminating in selecting new employees. Most whites who have remained at the company any length of time have ultimately reached a job paying a minimum of $3.50 per hour. Even those who have not progressed to skilled jobs are earning more than Negroes employed the same or longer periods of time. The company has presented neither evidence nor argument that these discrepancies stem from any identifiable differences based on ability, intelligence or aptitude. Title VII operates only prospectively. Local 189, United Papermakers & Paperworkers, AFL-CIO, et al. v. United States, 5 Cir. 1969, 416 F.2d 980. But it is not sufficient to meet its requirements that the employer merely end explicit racial discrimination. Id. at 988. "The Act should be construed to prohibit the *future awarding* of vacant jobs on the basis of a seniority system that 'locks in' prior racial classification.' Id. at 988. See also, United States v. Hayes International Corporation, 5th Cir. 1969, 415 F.2d 1038.

Plaintiffs suggest, "[A]ppropriate relief would be to require that the earnings of Negroes who began as laborers be adjusted to that being earned by whites with the same length of service who began as helpers. Only in this fashion can the consequences of the initial race discrimination and all of its ramifications be eliminated." But

this would severely penalize the defendant without providing Negro workers an opportunity to qualify for promotion to better jobs. More appropriate and enduring relief can be obtained by enabling Negro workers to secure the training and promotional benefits that have hitherto been denied them.

The proper solution to the problems raised by the company's discriminatory practices is to permit Negroes access to all jobs in the company that they have the skill and ability to do. In order to accomplish this result the company will be:

(1) Enjoined from filling any new or vacant "helper" positions until all Negroes presently employed are given an opportunity, on the basis of plant seniority, to bid for and transfer to these jobs competitively with any white employees who desire such transfers on the basis of plant seniority, provided that the employee desiring transfer can demonstrate his ability to qualify in the job to which he seeks transfer within a reasonable period of time, not to exceed 30 days after he applies for the transfer.

(2) Required to effect such transfers without any decrease in the transferring employee's hourly rate of pay, seniority, or other employment rights or benefits, since some Negroes, even though they have been discriminated against, have, as a result of seniority and ability, progressed to jobs paying more than the "helper" classification.

(3) Enjoined from filling any new jobs as "tacker" or transferring white employees to the "tacker" classification until all present Negro employees are given an opportunity to bid for and transfer to these jobs competitively with any white employees who desire such transfers, on the basis of plant seniority, provided that the employee desiring transfer can demonstrate his ability to qualify in the job to which he seeks transfer within a reasonable period of time, not to exceed 30 days after he applies for the transfer.

(4) Required to effect such transfers without decrease in the transferring employee's hourly rate of pay, seniority or other employment rights or benefits.

(5) Required to make available training and practicing opportunity in tacking, hooking, and other skills to those Negro employees who desire such training on the same terms and conditions upon which such training and opportunity are provided to white employees.

(6) Required to make known job vacancies generally to its work force by posting on bulletin boards, or by publicity in some other manner calculated to bring vacancies to the attention of all employees, regardless of race.

Such relief will permit Negroes access to the progression ladder, through its initial "learning" rungs, the helper and tacker jobs, without the penalty of a pay reduction as the price of achieving the equal treatment that they should originally have been afforded.

■ There can be little doubt of the court's authority to enter such an order. The Supreme Court has pointed out in another context:

"[T]he court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 1965, 380 U.S. 145, 154,[6] 85 S.Ct. 817, 822, 13 L.Ed.2d 709.

6. See also Local 189, United Papermakers & Paperworkers, AFL–CIO, et al. v. United States, 5 Cir. 1969, 416 F.2d 980. For further discussion of the court's equity powers in effectuating legislative policies, see Mitchell v. Robert De Mario Jewelry, Inc., 1960, 361 U.S. 288, 291–292; 80 S.Ct. 332, 4 L.Ed.2d 323; Ala-

Even if nondiscriminatory on its face, a practice that operates to perpetuate past discrimination must be enjoined under the court's equity powers.[7]

In Local 53, International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047, 1052 the Fifth Circuit held:

"In formulating relief * * * the courts are not limited to simply parroting the Act's prohibitions but are permitted, if not required, to 'order such affirmative action as may be appropriate' * * *. Where necessary to ensure compliance with the Act, the District Court was fully empowered to eliminate the present effects of past discrimination."

In *Vogler* the court approved an order by Judge Christenberry that not only enjoined the union from continuing to exclude Negro and Mexican-American workers from membership, but:

"* * * prohibit[ed] use of members' endorsements, family relationship or elections as criteria for membership; ordered that four individuals be admitted to membership and nine others be referred for work; ordered the development of objective membership criteria and prohibited new members other than the four until developed; and ordered continuation of chronological referrals for work, with alternating white and negro referrals until objective membership criteria are developed." 407 F.2d at page 1051.

Other courts have also enjoined policies that served to perpetuate past discrimination even when these policies were nondiscriminatory on their face. See Local 189, United Papermakers & Paperworkers, AFL-CIO, et al. v. United States, 5 Cir. 1969, 416 F.2d 980; and Quarles v. Philip Morris, Inc., E.D.Va.

1968, 279 F.Supp. 505. Nor does anything in the present decree interfere with the operation of a seniority system or grant preferential treatment on account of racial imbalance. Title VII, § 703(j); Local 189, United Papermakers & Paperworkers, AFL-CIO, et al. v. United States, 5 Cir. 1969, 416 F.2d 980.

## III. RELIEF FOR TURNER AND MAGEE

■ The discharge of Turner and Magee did not itself violate Title VII since it occurred after the enactment of that Title but five months before it became effective. However, plaintiffs assert that it violated a portion of the 1870 Civil Rights Act, Section 1981, 42 U.S.C. § 1981, which provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Prior to 1968, Section 1981, like the related sections of the early Civil Rights Acts, had been held applicable only to State action, not to acts by private individuals, although there were intimations in United States v. Guest, 1966, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239, that this interpretation might be too restrictive. In 1968, the Supreme Court reconsidered the scope of one of those provisions in Jones v. Alfred H. Mayer Co., 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189. It there held

bama v. United States, 5 Cir. 1962, 304 F.2d 583, 591, affirmed, 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112.

7. *See, e. g.*, United States v. Mississippi, 5 Cir. 1964, 339 F.2d 679; Franklin v.

Parker, M.D.Ala.1963, 223 F.Supp. 724, affirmed, 5 Cir. 1964, 331 F.2d 841; United States v. Louisiana (three judge court), E.D.La., 1963, 225 F.Supp. 353, 362, 385, affirmed, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709.

that 42 U.S.C. § 1982 was passed under the enabling authority of Section 2 of the Thirteenth Amendment rather than the Fourteenth Amendment and therefore that it applies to private as well as state discrimination.[8] Both § 1981 and § 1982 are derived from the same statute, Section One of the Civil Rights Act of 1866, 14 Stat. 27, which provided:

> "Be it enacted * * * that all persons born in the United States and not subject to any foreign power, * * * are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude * * * shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

The Court ruled in *Jones, supra* at 426, 88 S.Ct. at 2196, "that § 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute although only those deprivations perpetrated 'under the color of law' were to be criminally punishable

under § 2." [9] "In its original form, 42 U.S.C. § 1982 was part of § 1 of the Civil Rights Act of 1866." *Id.* at 422, 88 S.Ct. at 2194. It follows inescapably therefore that, if 42 U.S.C. § 1982 covers private discrimination in housing, 42 U.S.C. § 1981 covers private discrimination in making and enforcing contracts.

"[T]he right * * * to make and enforce contracts," afforded all persons by Section 1981, applies to contracts of employment as well as to other kinds of contracts. When Congress enacted the 1866 Act, it was concerned with the employment difficulties of the freed men. As Justice Stewart pointed out in *Jones, supra* at 427, 88 S.Ct. at 2197:

> "The congressional debates are replete with references to private injustices against Negroes—references to white employers who refused to pay their Negro workers, white planters who agreed among themselves not to hire freed slaves without the permission of their former masters * * *."

Furthermore in *Jones*,[10] the Court expressly overruled Hodges v. United States, 1906, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65, which had indicated that Section 1981 did not apply to a conspiracy by private individuals to interfere with a contract of employment. Subsequently, in Dobbins v. Local 212, International Brotherhood of Electrical Workers, S.D.Ohio 1968, 292 F.Supp. 413, 442, the only case to rule on Section 1981 since Jones v. Mayer, *supra*, private employment contracts were held

---

8. The court held in Dobbins, *supra*, 292 F.Supp. at 447, that remedial relief "should 'so far as possible eliminate the * * * effects of the past,' Louisiana v. United States, *supra*, and may, in this respect, affect otherwise valid or unlawful practices if that is necessary 'in order that the ground may be cleansed effectually from the vice of the former illegality,' United States v. Bausch and Lomb Optical Company, 321 U.S. 707, 724, 64 S.Ct. 805, 88 L.Ed. 1024." (Other citations omitted.) *See* Cooper and Sobol, "Fair Employment Criteria," 82 Harv. L.Rev. 1598, 1626–27 (1968).

9. Emphasis in the original Supreme Court opinion. The legislative history of § 1 of the 1866 Civil Rights Act was discussed in Justice Stewart's opinion in Jones v. Alfred H. Mayer Co., 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189. 42 U.S.C. § 1982 guaranteed all persons the same right "to inherit, purchase, lease, sell, hold, and convey real and personal property. * * * "

10. Jones v. Alfred H. Mayer Co., 1968, 392 U.S. 409, 441–442 n. 78, 88 S.Ct. 2186, 20 L.Ed.2d 1189.

to be covered by the Act. Thus the termination of Turner's and Magee's contractual relationship for racially discriminatory reasons would violate Section 1981, as interpreted in the light of Jones v. Mayer.[11]

The question remains whether that Section should be applied to cases involving private discrimination occurring before *Jones* authoritatively determined that the Act reaches such situations. We do not reach this issue on the facts presented here, for Turner and Magee urge only two claims under Section 1981, one for back pay and the other for reinstatement.

As there was no proof that the two suffered any loss of pay, nor of the amount of any such loss, it is unnecessary to decide whether they would be due compensatory damages had the amount been proved. For the same reason, we need not deal with the question whether an action for compensatory damages would be barred by the statute of limitations.[12]

Turner and Magee applied for reinstatement after the effective date of Title VII. 42 U.S.C. § 2000e–2, which is quoted in full above, makes it an unlawful employment practice for an employer "to fail or refuse to hire

* * * or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race * * *."

The evidence demonstrates that Turner and Magee were discharged on account of their race only six months before they sought re-employment. It is a fair inference from the testimony that, if an application for re-employment had been made by white employees who had been discharged without cause, they would have been rehired. The failure to re-employ Turner and Magee was a refusal to hire them because of their race and therefore constituted a violation of Title VII; hence relief should be granted under that Title whether or not it is also mandated by Section 1981. Turner and Magee are therefore entitled to reinstatement, with seniority credit from the date of their application.

## IV. ATTORNEY'S FEES

■ Plaintiffs are entitled to reasonable attorney's fees in accordance with 42 U.S.C. 2000e–5(k). *See* Newman v. Piggie Park Enterprises, Inc., 1968, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263.[13]

---

11. *Jones* indicates that 42 U.S.C. § 1982 "is not a comprehensive open housing law." Similarly, 42 U.S.C. § 1981 is not a comprehensive employment practice law. As said in *Jones*, "[A]lthough it can be enforced by injunction, it contains no provision expressly authorizing a federal court to order the payment of damages." 392 U.S. at 414, 88 S.Ct. at 2189. The court there indicated that "we need not decide here whether, in some circumstances, a party aggrieved by a violation of § 1982 might properly assert an implied right to compensatory damages." 392 U.S. at 414, n. 14, 88 S.Ct. at 2190. See the comprehensive discussion in Baylor, Liabilities under Civil Rights Statutes and Insurance Coverages Thereof, paper delivered before the Section of Insurance, Negligence, and Compensation Law, American Bar Association Convention, 1969, Dallas, Texas.

12. The Civil Rights Act, § 1981, provides no limitation period. In the absence of any express period, under companion § 1983, the courts have held that the period provided by the state statute for similar actions applies. O'Sullivan v. Felix, 1914, 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980; Crawford v. Zeitler, 6 Cir. 1964, 326 F.2d 119; Horn v. Bailie, 9 Cir. 1962, 309 F.2d 167. The Louisiana prescriptive period of one year under Civil Code Article 3536, applicable generally to delictual actions, might well be appropriate here with respect to any claim for damages. See O'Sullivan v. Felix, *supra.* Cf. Weiser v. Schwartz, E.D.La.1968, 286 F.Supp. 389, in which it was held that federal law determines when the period commenecs to run.

13. If counsel are unable to agree on the amount of the attorneys' fees, the Court will set a hearing to fix this.

The plaintiffs will prepare a decree in accordance with this opinion, and submit it to opposing counsel for approval. Upon submission of the decree, an injunction will be granted in favor of the plaintiffs.