James D. **ANDRES**

v.

**SOUTHWESTERN PIPE, INC.**

**Civ. A. No. 14025.**

United States District Court,
W. D. Louisiana,
Lafayette Division.

Jan. 27, 1971.

Collins, Douglas & Elie, Robert F. Collins, and Robert P. Roberts, Richard B. Sobol, George M. Strickler, Jr., and Rita L. Murphy, New Orleans, La., for plaintiff.

Chaffe, McCall, Phillips, Burke, Toler & Hopkins, David L. McComb, New Orleans, La., and Ben H. Lowell, Jr., Pow-

time-span due to elapse before the decision was handed down. Such fore-

knowledge would have changed that decision."

ell, Brown & Maverick, Stanley E. Rauhut, Houston, Tex., for defendant.

## OPINION OF THE COURT

PUTNAM, District Judge.

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for reinstatement and back wages, and to enjoin alleged unlawful employment practices. The plaintiff, a Negro, contends that he was discriminated against in his employment on account of his race.

## FINDINGS OF FACT

1. *Personnel at the Lafayette Office*

Defendant is a Texas corporation whose business is selling and delivering mud and various explosives which are used in oil exploration. Plaintiff, a resident of Grand Coteau, Louisiana, was employed by Southwestern Pipe, Inc. as a truck driver at its Lafayette dynamite magazine from August 16, 1966, to December 15, 1966. During that period defendant's Lafayette branch employed Mr. Robert Leyendecker (area supervisor), Edward Mire (magazine keeper), one salesman, four to six truck drivers, a driver's helper, and a laborer. The equipment driven consisted of pick-up trucks, bobtail trucks, and semi-trailer trucks. The Lafayette office was a small, loosely-run organization.

During the first eight months of 1966, defendant's monthly sales and deliveries of high explosives through its Lafayette office tripled, from approximately half a million pounds to nearly one and a half million pounds. In September, sales dropped sharply to less than 600,000 pounds, and continued to drop steadily to about 250,000 pounds in December, 1966.

The number of truck drivers employed by defendant during 1966 and 1967 corresponded roughly to the volume of sales. The Lafayette office began the year 1966 with four drivers: Ed Bourdier, Dolze Touchet, Irvin Gaspard, and Leroy Galtier. Bourdier had been employed by defendant for approximately nineteen years, Touchet for thirteen years, Gaspard and Galtier for two years. The latter two drivers had been hired at $325 per month. The phenomenal increase in business during the first eight months of 1966 necessitated the hiring of additional drivers for the first time in nearly two years.

Four drivers were hired by defendant during 1966, as reflected in the following table:

| Name | Date of Hire | Starting Monthly Salary |
|------|--------------|-------------------------|
| Lynn McCombie | March 16, 1966 | $350 |
| Noah Prejean | July 1, 1966 | $375 |
| James Andres | August 16, 1966 | $350 |
| James Cormier | September 1, 1966 | $375 |

Plaintiff Andres, the only Negro driver, was hired to replace McCombie, who quit on August 15, 1966. Cormier replaced Prejean, who quit on August 31, 1966.

2. *The Hiring of Andres*

Plaintiff was referred to defendant by an employment agency. Leyendecker had informed the agency that a position as truck driver was available at a starting salary of $350 per month. The agency notified Leyendecker that it wished to refer a James Andres for the position, and Leyendecker told the agency to send Andres over. Andres had been informed of the terms of the offer. While Andres was en route to the magazine, the agency called back and mentioned that Andres was a Negro; Leyendecker responded that it made no difference. When Andres arrived, Leyendecker interviewed him and offered him the position at $350 per month. Andres accepted freely, without objection and without attempting to bargain. He made no inquiries as to the salaries of other drivers at this time.

3. *The Hiring of Cormier*

Cormier was hired by Ed Mire, the magazine keeper, while Leyendecker was out of town. Mire offered Cormier $350, but Cormier responded that he

"could not make it" for $350. Mire raised the offer to $375, and Cormier accepted.

### 4. *Plaintiff's Discovery of Unequal Pay*

Plaintiff was assigned to check out Cormier by taking him on a delivery trip. Just after the commencement of this trip, plaintiff asked Cormier about his salary, and Cormier replied that he was making $375 per month. Plaintiff, who was driving, immediately pulled the truck off the road, went to a public telephone, called Ed Mire and complained about the difference in pay. Mire said he would speak to Leyendecker about it, but the evidence reflects that he never did.

### 5. *Working Conditions*

Much of the testimony at the trial dealt with the working conditions at the Lafayette magazine. Andres himself testified that he used the same sanitary facilities and drinking facilities as the other employees. He was invited to the employee parties, at which he drank beer and played cards with the other employees. He was not assigned more than his share of the menial labor around the magazine; in fact, the evidence shows that he was assigned less, since he lived in Grand Coteau and had trouble securing transportation to Lafayette on short notice. Ed Mire testified that because Andres lived farther away than the other drivers, he would not normally call him except to drive a load. Actually, Andres worked fewer total hours during his four months of employment than any other driver. He earned the highest average rate of pay *per hour on duty*. Moreover, he tied Galtier for the smallest number of trips taken.

The trips were assigned by Ed Mire on the basis of the ICC drivers' logs and his own estimate of equal distribution of the work load. Unfortunately, the logs were destroyed in the regular course of business and were not available at the trial. The reports compiled from the log books at the request of an investigator for the Equal Employment Opportunity Commission are not very helpful since they are limited to a comparison of the work loads of only two drivers, Andres and Cormier.

Plaintiff's counsel contends that Andres was assigned more of the onerous trips, such as the trips to Houston in a tractor-trailer to pick up supplies from the Houston office. However, plaintiff himself testified that these trips were not difficult trips—the truck was equipped with air conditioning and power steering, the driver made more in the way of expenses on a long haul, and the Houston crew loaded the truck while the driver slept. Plaintiff alleges further that he was given more weekend trips than any other driver, but the evidence shows that he was only second highest in this category. The average length of his trips was highest, but several drivers testified that they preferred long hauls, since they fared better on expenses.

### 6. *The Requests for a Raise*

On at least two occasions, plaintiff complained to the magazine keeper, Ed Mire, about his pay and asked for a raise. Mire told Andres he would look into it, but apparently never did. Mr. Leyendecker was in charge of magazines in several cities, and was frequently out of town. Communications between Mire and Leyendecker were generally poor. On the few occasions when plaintiff tried to see Leyendecker personally, Leyendecker was busy. Once when plaintiff was in Houston on a trip to pick up supplies, he took his complaint about salary directly to a company official, Mr. McClure, in the Houston office. McClure informed Mire, who then warned plaintiff never to attempt to by-pass him again on the matter of pay.

Defendant had no set policy of giving automatic raises after certain periods of employment. No drivers were shown to have received raises in less than three months. Some drivers, such as Galtier and Cormier, worked for six months or longer without a raise. Nor did defend-

ant have a policy of equal pay for equal work. The only policy which defendant was shown to have was that of securing good drivers for as reasonable a salary as possible—for "whatever the traffic would bear."

Apparently McCombie, whom plaintiff replaced, received one or more raises during his five months of employment. It is clear, however, that McCombie was doing most of the driving during the period when defendant's sales were undergoing an extraordinary increase.

### 7. *Termination of Plaintiff's Employment*

On the occasion of plaintiff's resignation, he and his fellow trailer-truck drivers, Cormier and Galtier, were at the magazine loading plaintiff's truck for a trip to Morgan City. Plaintiff told Cormier that he wanted to stay in town to pay some bills and asked Cormier to take the run for him. Cormier answered that he would do it if the magazine keeper approved it. Cormier then phoned Mire from the magazine and asked Mire if it would be all right to take plaintiff's run. Mire asked Cormier if Andres was sick, to which Cormier replied no, that Andres wanted to stay in town to pay some bills. Mire told Cormier that it was Andres' turn, that he had time before and after the trip to pay bills, and that he would just have to take his own trip. Cormier relayed this information to Andres, who then telephoned Mire himself and repeated the request. Mire refused to change his position. Andres told Mire that he would take the trip out, but that Mire could "fix up his papers," because he would leave at the end of the pay period. Mire made no protest and plaintiff did indeed leave at the end of the pay period, December 15, 1966.

On December 19, 1966, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission. All attempts to obtain voluntary compliance from the defendant were unavailing.

## CONCLUSIONS OF LAW

This action is predicated upon the Civil Rights Act of 1964, 42 U.S.C. § 2000e—2(a), which provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The Act does not prohibit discrimination in employment practices unless such discrimination is based upon race, color, religion, sex, or national origin. 42 U.S.C. § 2000e—2(h).

■ We find that the defendant is an "employer" under the Act. 42 U.S.C. § 2000e(b). The question of whether such an employer is guilty of discriminatory employment practices is basically one of fact for determination on a case-by-case basis. United States by Clark v. H. K. Porter Co., 296 F.Supp. 40 (N.D.Ala. 1968).

■ The burden is upon the plaintiff to show that his employer intentionally discriminated against him on account of his race. Clark v. American Marine Corp., 304 F.Supp. 603 (E.D.La.1969); Griggs v. Duke Power Co., 292 F.Supp. 243 (M.D.N.C.1968); modified in part, 420 F.2d 1225 (4th Cir. 1970), cert. granted, 399 U.S. 926, 90 S.Ct. 2238, 26 L.Ed.2d 791 (1970). The section specifying the relief which the court may grant provides, "If the court finds that the respondent has *intentionally* engaged in or is *intentionally* engaging in an unlawful employment practice charged in

the complaint," then the court may enjoin the practice or take other affirmative action, such as awarding back wages and reinstatement. Civil Rights Act of 1964, § 706(g), 42 U.S.C. § 2000e—5(g) (emphasis added). Senator Humphrey, a co-sponsor of the amendment which was ultimately adopted as the Civil Rights Act of 1964, said of this section in an explanatory statement:

"Section 706(g) is amended to require a showing of intentional violation of the title in order to obtain relief. This is a clarifying change. Since the title bars only discrimination because of race, color, religion, sex, or national origin it would seem already to require intent, and, thus, the proposed change does not involve any substantive change in the title. The express requirement of intent is designed to make it wholly clear that inadvertent or accidental discriminations will not violate the title or result in entry of court orders. It means simply that the respondent must have intended to discriminate." 110 Congressional Record 12295–99 (June 4, 1964).

However, it has been held that this intent need not amount to a specific intent in order to justify relief. Dewey v. Reynolds Metals Co., 304 F.Supp. 1116 (W.D.Mich.1969); Clark v. American Marine Corp., supra.

Not only has the plaintiff failed to show any intent on the part of defendant to discriminate against him on the basis of his race, but he has shown no discrimination in fact.

Certainly race was not a factor in the hiring of Andres. At the time Mr. Leyendecker contacted the employment agency, he had no idea whether the agency would refer Caucasions or Negroes. When he found out that a Negro was being referred, he replied that it did not matter and in fact hired Mr. Andres at the salary which he had previously quoted to the agency.

Nor was there any racial discrimination in the working conditions. Andres drove the same trucks as the white drivers, used the same sanitary and drinking facilities, attended the company socials, and actually did less of the manual labor around the magazine than the white employees. Furthermore, we cannot find from the evidence presented that he was given more onerous driving assignments than the other drivers, whether on account of his race or for any other reason.

Although it is true that plaintiff was earning $25 per month less than certain other drivers, this was the result not of any racial discrimination, but rather of the company's policy of hiring drivers at the most reasonable rates possible, beginning with an offer of $350. The white man whom Andres replaced had been hired at $350 per month. Cormier was offered $375 only after he had rejected an offer of $350.

The fact that plaintiff's salary was never raised is easily explainable if the evidence is considered as a whole. Business had dropped steadily throughout the term of plaintiff's employment. Sales in December were only one sixth of what they had been in August, yet the number of drivers was the same in those two months. Defendant had no policy of automatic raises, and no careful business organization would have been disposed to give raises during such a decline. Furthermore, it is clear that plaintiff's bypassing of the normal procedures in search of a raise did not sit well with his superiors at the Lafayette office. Any of these factors would explain the failure to raise his salary. Plaintiff has failed to show any *racially-motivated* reason why he did not receive a raise.

Likewise, we can find no racial discrimination in the circumstances surrounding the termination of plaintiff's employment. Our appreciation of the evidence is that he quit because he could not get the day off to pay some bills. Nor does the evidence justify a finding that defendant's action under these circumstances in allowing plaintiff to quit amounted to a discriminatory "constructive discharge."

Finally, plaintiff has failed to prove any company-wide pattern or practice of discrimination. The Lafayette office is just a small part of a much larger concern, and plaintiff introduced no evidence whatever as to company-wide policies.

In conclusion, we hold that plaintiff has failed to show that he was intentionally discriminated against in his employment by defendant on account of his race, color, religion, sex, or national origin.

For the foregoing reasons, judgment is rendered in favor of defendant, Southwestern Pipe, Inc., and against plaintiff, James D. Andres. The attorneys representing defendant will prepare a formal decree for signature in accordance with Rule 9(e) of this court, and submit same for signature forthwith. Judgment will not be entered until such decree is filed with the Clerk.