Juanita CAUSEY, Plaintiff,

v.

FORD MOTOR COMPANY, Sales and Parts Distribution Center, Jacksonville, Florida, et al., Defendants.

No. 72-348-Civ-J-S.

United States District Court,
M. D. Florida,
Jacksonville Division.

April 5, 1974.

1222

Johnson & Marshall, Jacksonville, Fla., for plaintiff.

Gary B. Tullis, C. Wayne, Alford, Ulmer, Murchison, Ashby & Ball, Jacksonville, Fla., for defendant Ford Motor Co.

Richard H. Frank, Tampa, Fla., for defendants UAW and Local 970.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. SCOTT, District Judge.

This is an action brought by the plaintiff, Juanita Causey, an employee of the defendant, Ford Motor Company (hereinafter referred to as "Ford"), pursuant to the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e et seq.), for alleged discrimination in her employment and against the United Automobile, Aerospace and Agricultural Workers of America (hereinafter referred to as the "UAW") and its Local 970 for alleged discrimination because of her sex in their representation of the plaintiff in connection with grievances which she allegedly asserted against Ford. The jurisdiction of this Court was further invoked pursuant to 28 U.S.C. §§ 1331 and 1343(4).

The plaintiff sought a preliminary and permanent injunction against the defendants enjoining them from engaging in the alleged discriminatory practices and also sought promotion, back

pay, compensatory seniority, and the award of a reasonable attorney's fee pursuant to 42 U.S.C. § 2000e–5(k).

This action was originally brought as a class action. Thereafter, the defendant Ford, pursuant to Rule 23(c)(1), Federal Rules of Civil Procedure, moved this Court to determine if this action could be properly maintained as a class action. This Court, by its Order entered herein on February 26, 1974, and for the reasons stated therein, found that this action was not properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure. Therefore, this action proceeded to trial on the plaintiff's individual claims against Ford, the UAW, and its Local 970. The trial of this action commenced on March 6, 1974, and terminated on March 11, 1974.

The gravamen of the plaintiff's complaint against Ford is that Ford: (1) discriminated against her by slanting its recruitment efforts toward contacts and sources more likely to yield male applicants for employment; (2) failed to hire her when she originally applied for employment, solely because of her sex; (3) discriminated against her in failing to rehire the plaintiff before it actually did rehire her; and (4) discriminated against her during her employment by failing to provide her adequate restroom facilities. With respect to the defendants, the UAW and its Local 970, the plaintiff complains that said defendants refused to represent her, solely because of her sex, in the disposition of grievances she allegedly asserted against Ford, thus failing fully and adequately to execute the duty of fair representation.

The Court finds upon consideration of the pleadings, the stipulations of the parties, the evidence, both testimonial · and documentary, and having heard the arguments of counsel, that Ford, the UAW and its Local 970 did not, at any time, discriminate against the plaintiff because of her sex. The Court, therefore, makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure. The Court notes that in resolving disputed questions of fact and conflicts in testimony, not resolvable from undisputed documentary evidence, it relied upon its evaluation of witnesses and the demeanor associated with the testimony.

## FINDINGS OF FACT

1. The plaintiff, Juanita Causey, is a citizen of the United States and a female caucasian residing in Jacksonville, Florida.

2. The defendant, Ford, is a corporation engaged in the warehousing, sale and distribution of automobile parts and accessories in the north Florida and south Georgia areas and is an employer within the meaning of 42 U.S.C. § 2000e(b). As part of this operation, Ford maintains and operates a large warehouse facility in Jacksonville, Florida, from which it distributes various automobile parts.

3. The defendant, UAW, is a voluntary, unincorporated association having its principal offices in Detroit, Michigan, and it is a labor organization within the meaning of 42 U.S.C. § 2000e(d). Ford and the UAW are parties to a master collective bargaining agreement dated December 7, 1970.

4. The defendant, Local 970, is an affiliate of the UAW and in conjunction with the UAW is the exclusive bargaining representative of all employees within the contract unit governed by a master collective bargaining agreement in existence between the UAW and Ford. Local 970 is a labor organization within the meaning of 42 U.S.C. § 2000e(d).

5. The UAW, Local 970, and Ford have expressly recognized within the master collective bargaining agreement the moral principles involved in the area of civil rights and have reaffirmed their commitment not to discriminate against employees because of race, creed, color, age, sex, or national origin.

6. Ford normally employs sixty to sixty-five employees at the warehouse

facility in Jacksonville, Florida. These employees are responsible for the receipt of new automobile parts and the shipment of such parts to various dealers or automobile repair shops throughout the states of Florida and Georgia. The employees at the warehouse are classified as stockhandlers, warehousemen, receiving, claims and shipping checkers, dingmen, truck drivers and maintenance.

7. A "stockhandler" is basically a janitorial position which includes the duties of sweeping, operating a gas-operated sweeper, picking up trash and otherwise maintaining the warehouse in a clean condition. The duties of a "warehouseman," which is a higher classification than a stockhandler, include the picking of orders for customers in the proper quantity and items required by a customer order and the stocking of in-bound material from outside vendors. Both the stockhandler and warehouseman are required, in carrying out their duties, to lift heavy automobile parts and the wooden pallets upon which these parts are transported.

8. On January 18, 1971, the plaintiff, through the efforts of her husband who is also an employee of Ford at the parts distribution warehouse, filed an application for employment with Ford, seeking employment at the warehouse. At the time the plaintiff filed her application for employment, there were 290 applications on file, which were filed in 1970, and an additional 21 applications which were filed in 1971, prior to the date of plaintiff's application. There were also four applications filed on the same date that the plaintiff filed her application. Prior to the filing of plaintiff's application, there were two female applicants for employment at the warehouse who applied in 1969 and two female applicants who applied in 1970.

9. The plaintiff, who was the first female employee hired by Ford at its warehouse facility, was hired as a stockhandler on July 29, 1971. She was thereafter laid off, because of a reduction in work force, on August 5, 1971. She was rehired on October 4, 1971, and was again laid off, for the same reason, on October 29, 1971. On March 6, 1972, she was rehired and worked continuously at the warehouse until January 18, 1974, when she was laid off, with four or five other employees, because of a reduction in work force.

10. Pursuant to Article VIII, Section 4(a), of the collective bargaining agreement between Ford and the UAW, the plaintiff could not and did not acquire seniority status until she achieved 90 days of continuous employment. Until such time, the plaintiff was a "probationary employee" pursuant to such agreement and did not become a "seniority employee" until on or about June 6, 1972 (90 days after the plaintiff was rehired on March 6, 1972).

### A. Ford's Recruitment Methods

11. It is evident that there was and is very little turnover of employees at the Ford warehouse facilities. There are normally 60 to 65 employees at the warehouse and because of the unusually good rate of pay, very few employees quit their job at the warehouse facilities after they are hired. During the time period from October of 1971 until December of 1972, there were only 11 new employees hired at the warehouse facility. As a consequence of the unusually low turnover, it was and is unnecessary that Ford actively recruit new employees at the warehouse facilities.

12. New employees for the warehouse facilities are obtained through several methods. There are numerous "walk-in" applicants. These are individuals seeking employment who appear at the warehouse facility to file an application without having been solicited to do so. In addition, during 1971 Ford would, from time to time, solicit minority group employees from the National Alliance of Businessmen. This is an organization that encourages industry to hire persons from underprivileged and minority groups. Also, as a third source of new employees, the employees actually working in the warehouse would refer applicants to Ford for possible em-

ployment. In fact, the plaintiff applied for employment at the warehouse and was hired because she was referred to the warehouse by her husband, who was also an employee of the warehouse.

13. Ford did not have any recruitment effort "slanted" toward contacts and sources more likely to yield male applicants. On the contrary, there was no active recruitment program and the plaintiff was, in fact, a product of the recruitment system which she now complains about. The plaintiff has simply failed to produce any evidence showing that Ford discriminated against her in its methods of acquiring new employees.

### B. *The Hiring of Plaintiff*

14. During the period between the date the plaintiff first made application for employment and the date that she was hired by Ford (January 18, 1971–July 29, 1971), five male applicants were hired by Ford at the warehouse facility. The plaintiff claims that Ford discriminated against her by hiring these five male applicants before she was actually hired.

15. When the plaintiff first made application for employment, on January 18, 1971, she had had no prior warehouse experience. and had been a housewife for most of her 33 years.

16. Subsequent to the filing of plaintiff's application, there was nobody hired at the warehouse until April 13, 1971. During the time period between plaintiff's application date and April 13, 1971, there were not any openings at the warehouse. A male applicant was hired at the warehouse on April 13, 1971. This applicant had prior warehouse experience and had, in the judgment of Peter Manion, the warehouse operation manager, the ability to perform the work at the warehouse. On April 28, 1971, another male applicant was hired. This applicant had had prior experience at the National Parts Depot of Ford Marketing Corporation in Livonia, Michigan. On May 10, 1971, a son of one of the employees at the warehouse was hired. The father of this applicant had,

on several occasions prior to the date of plaintiff's application, requested the Depot Manager, Charles T. Stuart, to hire his son.

17. When the plaintiff learned that Ford was hiring applicants at the warehouse, she went to the warehouse for an interview. At that time, there were no openings. However, notwithstanding the fact that there were no openings and that she knew nothing of the qualifications of the applicants who had been hired, the plaintiff, in the early part of May, 1971, carried a picket sign in front of the Ford facility.

18. In July of 1971, three applicants, including plaintiff, were hired as stockhandlers at the warehouse. Plaintiff was hired on July 29, 1971. The other applicants, both male, were hired on July 27 and July 28, 1971.

19. The Court finds that the three male applicants who were hired in April of 1971 before the plaintiff was hired, were hired solely on their qualifications to perform the work at the warehouse facility. Moreover, Ford demonstrated, by hiring the plaintiff when an opening became available shortly after the applicants were hired in April, that it did not pursue a policy of sex discrimination in hiring. The Court, therefore, finds no merit in the plaintiff's claim that she was discriminated against, because of her sex, when she was hired.

### C. *The Rehiring of Plaintiff*

20. After the plaintiff was hired, she and two other employees were laid off on August 5, 1971, because the temporary work load increase, for which they were hired, had passed and they were no longer needed at the warehouse. Plaintiff was rehired on October 4, 1971. While the plaintiff was laid off and before she was rehired, Ford hired five new male employees. The plaintiff contends that Ford discriminated against her by hiring these new male applicants before she was rehired on October 4, 1971.

21. It should first be noted that pursuant to the terms of the collective bar-

gaining agreement between Ford and the UAW, the plaintiff was, at this time, a probationary employee and did not have any recall rights.

22. During the plaintiff's initial work period, that is, between July 29, 1971, and August 5, 1971, her presence in the warehouse caused the plaintiff, her husband, and Ford considerable problems. In fact, so far as her husband was concerned, these problems began when his fellow warehouse employees first learned that the plaintiff had filed an application for work in the warehouse. After that, her husband was continuously harassed by the other employees in the warehouse. This harassment against the plaintiff's husband continued throughout the time period of the plaintiff's first employment. On at least one occasion, the plaintiff and her husband had to request police protection to get from the warehouse to their home. Shortly after the plaintiff's initial work period, during a company-sponsored fishing trip for the warehouse employees, the plaintiff's husband was physically assaulted by some of his fellow employees. After this fishing trip, the plaintiff's husband was accompanied to his car by Mr. Stuart and another Ford employee. At this time, the plaintiff's husband requested a transfer to another Ford facility outside of Jacksonville.

23. The plaintiff's presence in the warehouse was resented by fellow employees because both she and her husband were, together, earning more wages than other employees in the warehouse. One of the witnesses called by the plaintiff verified that this was the plaintiff's "main problem."

24. During the plaintiff's initial work period at the warehouse, she was also harassed by the other employees. This included the discarding of unneeded boxes in the aisles where the plaintiff was working which rendered the performance of her duties more difficult. However, the practice, referred to by witnesses for Ford and the UAW as the "box treatment," was administered uniformly to all new warehouse employees without regard to race, color, national origin, or sex. The "box treatment," however, continued in the case of the plaintiff for a longer period than was normally associated with newly hired employees. The apparent reason for the extended "box treatment" was the fact that the plaintiff openly displayed a reaction to the "treatment" which in turn prompted other warehouse employees to persist in their annoying behavior, despite the efforts of the warehouse manager and foremen to prevent it.

25. During her initial employment in the warehouse, it was apparent that the plaintiff could not perform all of the duties that a stockhandler would normally perform, although it is clear that she was not required to perform any greater tasks or work of a different nature than a stockhandler would normally perform. For example, the plaintiff could not lift and remove from the aisles the wooden pallets upon which stock was shipped to the warehouse. The stockhandler's duties normally included the removal of these pallets from the aisles between the stock bins and the placing of them on the trash bins for removal from the warehouse. The fact that the plaintiff could not perform this work caused additional problems in the warehouse, in that other employees had to perform this work for the plaintiff and they complained to the Warehouse Manager because they had to do the work the plaintiff could not do.

26. It was also evident that the plaintiff's attitude about her job was very poor. Her immediate employee foreman testified that she constantly complained about everything, although he gave her more training than other stockhandlers he had trained and, finally, had to "fit the job" around her.

27. The testimony and the demeanor of the plaintiff when testifying before the Court disclosed that she not only lacked the ability easily and quickly to comprehend but also an emotional attitude which the Court finds as a causation for at least some of her difficulties

as an employee. There is substantial evidence to sustain the contention that her performance was less than satisfactory.

28. The testimony of Charles T. Stuart and Peter Manion, both managing agents of Ford, corroborated the testimony of other witnesses that the warehouse employees were antagonistic to the plaintiff and her husband. During the period between August 5, 1971, and October 4, 1971, the latter date being the date on which the plaintiff was rehired by Ford, they were present on a fishing trip sponsored by Ford during which employee resentment toward the plaintiff's husband was openly displayed. It was on this occasion that the plaintiff's husband was assaulted and battered by unidentified employees.

29. It is evident to the Court that the hiring of the new employees before the rehiring of the plaintiff had nothing to do with her sex. Because of the requested transfer by the plaintiff's husband, the plaintiff's disruptive influence in the warehouse, her attitude and inability to do the work of a stockhandler, and the genuine concern by Ford for the welfare and safety of the plaintiff and her husband, Ford was naturally hesitant to rehire the plaintiff at the warehouse. In fact, as Charles T. Stuart and Peter Manion testified, Ford was considering not rehiring the plaintiff at all. However, when the plaintiff's husband failed to contact the Depot Manager concerning his requested transfer, the plaintiff was rehired at Ford on October 4, 1971, and, except for temporary layoffs, has been a Ford employee continuously ever since.

### D. *The Restroom Facilities*

30. The plaintiff contends that Ford discriminated against her by failing to provide adequate restroom facilities for females in the warehouse. Although the plaintiff testified that at the time she was first hired at the warehouse there were no separate facilities for females, the evidence shows that there was, in fact, a separate restroom facility for females at such time period. At the time the plaintiff was first hired at the warehouse, there was a metal sign on the restroom door designating that as a facility for females. Apparently, this sign was torn down by one of the employees and was then replaced by a cardboard sign. The cardboard sign was later replaced again by a metal sign. During the plaintiff's first period of employment at the warehouse, a notice was posted on the bulletin board in the warehouse, stating that the female restroom facility was, thereafter, only to be used by females. This restroom facility appears on the original plans for the warehouse.

31. The plaintiff also complains because at the time she first reported to work at the warehouse, certain materials were stored in the anteroom or lounge of the female restroom facilities. This consisted of janitorial supplies and written materials belonging to the Union. This material was removed from the restroom by Ford in the first few days the plaintiff was employed at the warehouse. Although the plaintiff testified, that, at one time, she discovered a male using the female facility, there was no evidence presented as to who this male was and the Court finds that such use by a male was without the knowledge of Ford.

32. The plaintiff did not complain to her foreman or to the warehouse manager about the adequacy of the restroom facilities, nor did she file a grievance with the UAW concerning the restroom facilities. The plaintiff herself testified that the facilities were adequate as a restroom and that she in fact, used the facilities for that purpose.

### E. *The Plaintiff's Representation by the UAW and Local 970*

33. As previously stated, on October 4, 1971, the plaintiff was rehired and began her second period of employment with Ford in the warehouse. A reduction in force required her lay off on October 29, 1971. The testimony of the plaintiff that she orally complained or grieved to Clyde Davis, a union commit-

teeman, that her lay off on that date was effected solely because of her sex and that male applicants had been hired in September of 1971, during her period of lay off, was controverted by the defendant labor organizations. The Court does not credit the plaintiff's testimony that in October of 1971, after her re-employment, she grieved the fact that she was not rehired in September of 1971. Apart from the fact that in September of 1971 the plaintiff had not had a sufficient period of continuous employment, required by the collective bargaining agreement, to qualify as a permanent employee entitled to recall to employment in September of 1971, the Court finds no evidence in the record to sustain the contention that she was not rehired in September because of her sex. Moreover, the unrefuted credible evidence reveals that she did not attempt to grieve any claim she may have had stemming from September, 1971, until March 21, 1972, following the beginning of her third period of employment. The credible evidence upon which the Court relies in rejecting the plaintiff's assertion that she grieved her September, 1971, nonre-employment in October of 1971, is the grievance form prepared by Clyde Davis and executed by the plaintiff dated March 21, 1972. Such grievance was denied by Ford on March 23, 1972, and the defendant labor organizations' determination not to process the grievance further because of the plaintiff's lack of eligibility for recall in September of 1971 was consistent, as the Court finds, with the pertinent provisions of the collective bargaining agreement.

34. The plaintiff's testimony discloses that "her feeling" alone supports the contention that the defendant labor organizations had not fairly represented her because she is a female. The plaintiff testified that sometime in May, 1972, she was promoted to the classification of warehouseman. However, on June 5, 1972, she was demoted to the less remunerative position of a stockhandler. On June 7, 1972, the plaintiff lodged her demotion grievance with Clyde Davis who promptly pursued her claim with Ford. Her grievance was prosecuted to the contractual end point as is evidenced by the fact that an impartial umpire heard the grievance and resolved the grievance, and he directed that the plaintiff be restored to the warehouseman classification. The plaintiff testified that she was not dissatisfied with the handling of the grievance by the labor organizations, but rather, was displeased only with the umpire's decision not to award her back pay.

35. The plaintiff's third claim of discrimination by the labor organization was founded upon her grievance concerning Ford's refusal to grant her a "lift license." The plaintiff admitted that she voluntarily abandoned such grievance without any intimidation or coercion.

36. The plaintiff's testimony discloses that her grievances were handled no differently from grievances filed by male employees.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and of the parties to this action in accordance with 42 U.S.C. § 2000e et seq., and 28 U.S.C. §§ 1331 and 1343(4).

2. The defendant Ford is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e et seq.).

3. The defendants, the UAW and its Local 970, are labor organizations within the meaning of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e et seq.).

4. With respect to Ford, the applicable statute in this action is 42 U.S.C. § 2000e–2(a), which provides that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin. . . .

The Act, of course, does not prohibit discrimination in employment practices unless such discrimination is based upon race, color, religion, sex or national origin. Andres v. Southwestern Pipe, Inc., 321 F.Supp. 895 (W.D.La.1971), aff'd 446 F.2d 899 (5th Cir. 1971); Frockt v. Olin Corporation, 344 F.Supp. 369 (S.D. Ind.1972). The question of whether Ford has engaged in such discriminatory practices is essentially one of fact to be resolved on a case-by-case basis. Frockt v. Olin Corporation, *supra.*

■■ 5. In order to prevail against Ford under § 2000e–2 of 42 U.S.C., the plaintiff has the burden of showing by a preponderance of evidence that Ford discriminated against her on account of sex. Frockt v. Olin Corporation, *supra*; Andres v. Southwestern Pipe, Inc., *supra*; Barnes v. Lerner Shops of Texas, Inc., 323 F.Supp. 617 (S.D.Tex.1971). After hearing all of the evidence presented at the trial of this action, it is obvious to this Court that the plaintiff was never discriminated against by the defendant Ford because of her sex. The defendant Ford presented substantial, if not overwhelming, evidence that the plaintiff was unable to perform all of the duties of a stockhandler and that she was unable to get along with her fellow employees at the warehouse. Indeed, the management of Ford showed, and continues to show, a great deal of patience with the plaintiff. When she first started working, she actually received more training than a stockhandler normally receives. It appears that Ford finally had to "fit the job" around the plaintiff.

■ 6. The plaintiff was, in fact, hired by Ford shortly after there became an opening in the warehouse. She was subsequently laid off because of a decrease in the work load at the warehouse. The plaintiff was then rehired as stockhandler and has, with the exception of two temporary layoffs because of decrease in work loads, continuously worked at the warehouse since March 6, 1972. The Court is of the opinion that the delay in rehiring the plaintiff until October 4, 1971, was motivated solely and simply by the problems that plaintiff created in the warehouse and the concern by Ford for the safety and welfare of the plaintiff and her husband.

7. It is also significant that Ford has hired six or seven female employees at the warehouse since the plaintiff was employed on July 29, 1971. It is perhaps, more significant that these female employees did not experience the problems or cause the disruption in the warehouse as did the plaintiff. The plaintiff testified that the male employees assisted these other female employees. In the words of the plaintiff's husband, "They were treated like queens."

8. The evidence offered by the plaintiff, particularly her own lack of candor and contradictory testimony, reveals that she misconstrued routine warehouse procedures, had numerous conflicts with other warehouse employees and Ford personnel, and as a result, formulated a theory of sex discrimination without a supporting factual basis. As stated by the Court in *Barnes, supra*:

> This is not a case that turns on the issue of race; instead, it turns on the personalities of people and their ability to work together. As a result, the plaintiff's evidence in this case falls far short of its aim. 323 F.Supp. at 622.

9. With respect to the plaintiff's claim against the UAW and its Local 970, there is extant a master collective bargaining agreement between the UAW and Ford governing a broad range of matters associated with rank and file employees within the contract unit with regard to wages, hours, working conditions and procedures to be utilized for

the amicable settlement of grievances that may arise during the term of the collective bargaining agreement.

■■■■ 10. The defendants, the UAW and its Local 970, are charged with the statutory duty of representing all employees within the contract unit. Steele v. Louisville & N. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Tunstall v. Brotherhood of Locomotive, etc., 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); and, Wallace Corp. v. N. L. R. B., 323 U.S. 248, 65 S.Ct. 238, 89 L. Ed. 216 (1944). A breach of such duty, however, occurs only when there has been a breach of the collective bargaining agreement by the employer and the labor organizations' action or inaction toward the aggrieved employee's grievance is arbitrary, discriminatory, or motivated by bad faith. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

■■■■ 11. The defendants, the UAW and its Local 970, properly determined not to pursue the plaintiff's March 21, 1972, seniority grievance in light of relevant contract provisions and the plaintiff's failure to provide that Ford breached the collective bargaining agreement. The defendants, the UAW and its Local 970, did not breach the statutory duty of fair representation for the added reason that the plaintiff has no absolute right to compel the pursuit of a groundless grievance and the plaintiff's evidence failed to prove that the conduct of such defendants was arbitrary, discriminatory, or undertaken in bad faith. Turner v. Air Transport Dispatchers' Assoc., 468 F.2d 297 (C.A. 5, 1972); Encina v. Tony Loma Boot Company, Inc., 448 F.2d 1264 (C.A. 5, 1971); Lomax v. Armstrong Cork Company, 433 F.2d 1277 (C.A. 5, 1970); and Acuff v. Papermakers & Paperworkers, 404 F.2d 169 (C.A. 5, 1968).

12. The plaintiff, while employed in her first period of employment, July 29, 1971, through August 5, 1971, was a probationary employee pursuant to the pertinent provisions of the collective bargaining agreement, and she had no seniority or recall rights entitling her to preferential employment in September of 1971.

13. The plaintiff, during her second period of employment, October 4, 1971, through October 29, 1971, was a probationary employee and she had no seniority or recall rights. Thus, even assuming that the plaintiff had in fact sought to file a grievance against Ford in that period because Ford hired male applicants rather than re-employing the plaintiff, the plaintiff's grievance would have been without merit for the reason that she had not acquired any seniority as of October 29, 1971, and hence had no recall right under the terms of the collective bargaining agreement.

■■■■ 14. The defendants, the UAW and its Local 970, adequately represented the plaintiff with respect to her demotion grievance filed against Ford during her third period of employment, March 6, 1971, to January 18, 1974.

■■■■ 15. The plaintiff's voluntary abandonment of her "lift license" grievance relieved the defendants, the UAW and its Local 970, from any obligation to process that grievance.

The Court, therefore, finds and concludes by the evidence before it that:

(a) The burden was on plaintiff to show by a preponderance of the evidence that the defendants Ford, the UAW, or its Local 970, discriminated against her because of her sex;

(b) The plaintiff has failed to show by a preponderance of the evidence that the defendant Ford failed to hire or rehire her because of her sex or in any other way discriminated against her with respect to her employment at Ford Motor Company because of her sex; and

(c) The plaintiff has failed to show by a preponderance of the evidence any discriminatory conduct on the part of the defendants, the UAW or its Local 970, in the representation of the plaintiff in any matter.

Accordingly, it is

Ordered and adjudged:

1. That the plaintiff's request for temporary and permanent injunctive relief against the defendants, the UAW and its Local 970, is denied.

2. That the plaintiff's claim for promotions, back pay, and compensatory seniority is denied.

3. That the plaintiff's claim for attorney's fees must fail in view of the Court's decision upon the merits.

4. That the plaintiff be taxed with the costs of this litigation.