**Harold FRANKS, Plaintiff-Appellant,**
**Johnny Lee, Intervenor-Appellant,**

v.

**BOWMAN TRANSPORTATION COMPANY et al., Defendants-Appellees.**

No. 72-3239.

United States Court of Appeals,
Fifth Circuit.

June 3, 1974.

Rehearing Denied July 15, 1974.
Rehearing and Rehearing En Banc
Denied Sept. 12, 1974.

Howard Moore, Jr., Elizabeth R. Rindskopf, Atlanta, Ga., for Harold Franks.

Jack Greenberg, William L. Robinson, Morris J. Baller, New York City, for Johnny Lee.

William M. Pate, Atlanta, Ga., for Bowman Transp. Co.

Robert B. Hocutt, James W. Dorsey, Atlanta, Ga., for Union et al.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

**THORNBERRY, Circuit Judge:**

After processing a complaint through the EEOC, appellant Franks brought this racial-discrimination civil rights suit under Title VII, § 706, of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-5, and under 42 U.S.C.A. § 1981 on behalf of himself and those similarly situated against his former employer, Bowman Transportation Company, and his union.[1] He alleged a discriminatory refusal to promote and a discriminatory discharge, and he sought extensive declaratory and equitable relief for himself and for class members. Lee was permitted to intervene as plaintiff to press his individual claim against Bowman for a discriminatory refusal to hire and for a discriminatory discharge and to represent other classes of black Bowman employees and job applicants. The district court found after a three-day trial that Franks had established the factual bases for his individual claim, but it dismissed his individual action be-cause it concluded Franks had waited beyond the applicable limitations period to file suit. The court held that Lee factually established his claim for a discriminatory refusal to hire, but failed to prove his claim for discriminatory discharge, and it accordingly entered judgment partly for him and partly against him. As to the classes represented, the court found that past racial discrimination had been demonstrated and that the departmental seniority system maintained by Bowman and the union perpetuated the effects of past discrimination. As a remedy, the court enjoined Bowman from discriminating along racial lines in the future, ordered that certain class members be allowed to utilize company seniority accumulated before the date on which discrimination had ceased, and afforded certain discriminatees who responded to a notice from Bowman within thirty days priority in consideration for employment. The court declined to grant further affirmative relief requested, including the use of full company seniority for certain discriminatees, measures to ensure hiring and training of greater numbers of blacks in the future, and a requirement that Bowman file periodic reports with the district court to demonstrate compliance.

On this appeal we are asked to review the district court's adverse rulings on the individual claims of Franks and Lee and to determine whether the district court abused its discretion in not affording greater affirmative relief to the classes they represented. We shall discuss the pertinent facts in connection with the various claims.

### I. Franks' Individual Claim: Limitations and Laches

Bowman is an interstate trucking company which operates as a common carrier licensed by the Interstate Commerce Commission throughout southeastern United States and in parts of the

---

1. International Union of District 50, Local No. 13600, Allied and Technical Workers of the United States and Canada. Also included as a party defendant was the national un-ion of which Local 13600 is a part, International Union of Allied and Technical Workers of the United States and Canada.

mid-west.[2] Its principal terminals are in Atlanta, Birmingham, Charlotte, and Richmond.

Franks, a Negro, was first hired at Bowman's Atlanta terminal in 1960 as a "tire man,"—a position which requires the most menial work at the terminal and brings the lowest pay. Except for a one-year period in 1961 and 1962 during which he was assigned as a "grease man," Franks worked as a tire man continuously until 1965, when he resigned due to an injury. In 1966 he was re-hired as a tire man. After his return Franks attempted on several occasions to obtain a transfer, or promotion, into another job, but his way was blocked by Bowman's racially discriminatory policy of employing blacks only in the Tire Shop.[3] Although Bowman agreed in a collective bargaining agreement signed in 1967 to allow transfers and to hire without regard to race, the discriminatory policy was in fact continued in effect unofficially after 1967. Both before and after 1967 Franks was told that blacks could not transfer, or be promoted, from the Tire Shop. The district court found that but for Bowman's discriminatory policy, Franks should reasonably have been promoted to a higher paying, "dock worker" position by the end of 1967. No challenge is made to this finding.

Having watched white workers hired "off the street" into higher paying positions for which he was qualified and had applied, Franks filed a complaint with the Equal Employment Opportunity Commission on March 25, 1968, charging that Bowman refused to promote him because of its racially discriminatory policy of employing blacks only in the Tire Shop. EEOC officials visited the Atlanta terminal on two occasions, on April 23, 1968 and on May 10, 1968 to investigate Franks' charges. A few hours after the second visit Bowman discharged Franks, assertedly for "unauthorized bobtailing," or using company vehicles for personal errands. The district court rejected this purported explanation, however, and found that Franks was discharged "for reasons of race." On May 13, 1968 Franks filed a second complaint with the EEOC, alleging a discriminatory discharge.

Efforts to resolve the dispute through conciliation having failed, on March 21, 1969 Franks' then attorney requested the EEOC to issue a § 706(e) "suit letter" covering both complaints, and such a letter was sent on the same day to Franks' mailing address by certified mail, return receipt requested. Franks resided at 5339 Victory Drive in Morrow, Georgia, but he received his mail at 5319 Victory Drive, where his grandmother, sister, and nine-year-old nephew resided. On March 22 his nephew received the letter and signed the postal receipt, but he lost the letter before delivering it to Franks. Franks learned that his nephew had signed for some letter, but he never saw or received the letter personally. About a year later, on March 20, 1970 Franks contacted EEOC officials again about his dispute with Bowman, and, upon being shown the postal receipt for the first suit letter, affirmed in an affidavit that he had not personally received it. Franks then retained his present attorneys and filed "amended" charges with the EEOC which substantially duplicated the earlier charges. A second suit letter issued on April 14, 1971, and Franks filed a suit less than a month later on May 5, 1971.

On these facts the district court held Franks' Title VII and his Section 1981 claim barred. As to the Title VII action, the court reasoned that the thirty-day statutory limitations period[4] began to run on March 22, 1969, the date the first suit letter was delivered to Franks'

2. Bowman's operations and procedures are described more fully at the beginning of part III of this opinion, *infra*.

3. Two blacks who worked as "cleanup men" in the Trailer Shop were exceptions.

4. The 1972 amendments to the Civil Rights Act of 1964, P.L. 92–261 § 14, 86 Stat. 113, extended the limitations period from thirty days to ninety days.

mailing address, so that the action was barred after April 21, 1969. As to the § 1981 action, the court concluded that a two-year Georgia statute of limitations was applicable and that it barred the claim since the suit had not been filed for almost three years after Franks' discharge on May 10, 1968.

■ The statutory language which established the thirty-day limitations period applicable to Franks' Title VII action is found in § 706(e) as it read before the 1972 amendments: [5]

> If within thirty days after a charge is filed with the Commission [or within sixty days, if the Commission acts to extend the period] the Commission has been unable to obtain voluntary compliance with this subchapter, the Commission shall so notify the person aggrieved and a civil action may, within thirty days thereafter be brought against the respondent named in the charge (1) by the person claiming to be aggrieved. . . .

The key word in the statute is "notify"; the limitations period begins to run upon notification of the aggrieved party.[6] This Court has held that such notification takes place only when "notice of the failure to obtain voluntary compliance has been sent *and received.*" Miller v. International Paper Co., 5th Cir. 1969, 408 F.2d 283 (emphasis added). There being no question that the EEOC mailed the statutory notice to Franks, the Title VII limitations issue must be framed in terms of whether Franks constructively "received" the letter, even though it never actually came into his hands. We hold that Franks did not "receive" the first suit letter, and that the thirty-day limitations period began to run only when the second suit letter actually reached him

or his attorney. Genovese v. Shell Oil Co., 5th Cir. 1973, 488 F.2d 84. Since suit was filed within thirty days of the receipt of the second suit letter, the Title VII action was not barred by the § 706(e) limitations period.

We do not deal here with service of process or receipt of an offer or acceptance to make a contract, but with the interpretation of Title VII. The courts have consistently construed the Act liberally to effectuate its remedial purpose, and we think this purpose would be poorly served by the application of a "constructive receipt" doctrine to the notification procedure. More narrowly, the purpose of the statutory notification, which is "to provide a formal notification to the claimant that his administrative remedies with the Commission have been exhausted," Beverly v. Lone Star Lead Construction Corp., 5th Cir.1971, 437 F.2d 1136, and to inform him that the thirty-day period has begun to run, has not been accomplished unless the claimant is actually aware of the suit letter. In terms of the policy behind limitations periods generally, the claimant can hardly be said to have slept on his rights if he allows the thirty-day period to expire in ignorance of his right to sue.

Our holding that the statutory notification is complete only upon actual receipt of the suit letter accords with the view we have expressed in prior cases that Congress did not intend to condition a claimant's right to sue under Title VII on fortuitous circumstances or events beyond his control which are not spelled out in the statute. Thus, in Beverly v. Lone Star Lead Construction Corp., supra, we concluded that the EEOC's failure to find reasonable cause to suspect a Title VII violation was not a jurisdictional barrier to a claimant's

---

5. See note 4 supra.

6. The statute does not establish an aggregate ninety-day limitations period (*i. e.,* the aggregate of the maximum sixty-day conciliation period and the thirty-day right-to-sue period) which begins to run on the date the charge is filed. Miller v. International Pa-

per Co., 5th Cir. 1969, 408 F.2d 283. The statute does not specify any certain limit on the time which may pass between the expiration of the conciliation period and the statutory notification, which starts the thirty-day period. *See id.; see also* 29 C.F.R. § 1601.25a.

Title VII suit because Congress did not intend to make a claimant's statutory right to sue subject to "such fortuitous variables as workload, mistakes, or possible lack of diligence of EEOC personnel." *Id.* at 1140. Similarly, in Dent v. St. Louis-San Francisco Railway Co., 5th Cir. 1969, 406 F.2d 399, we held that the EEOC's failure to attempt to effect voluntary conciliation did not bar a Title VII suit because a claimant's right to sue was not dependent on acts or omissions of the EEOC which were "beyond the control of the aggrieved party." *Id.* at 403. In this case we are not confronted with any delay or mistake on the part of the EEOC, but with the loss of the first suit letter by Franks' nine-year-old nephew. This loss must be characterized as a fortuitous event, however, just as loss of the letter in the EEOC office before mailing or loss by the postal department would have been.

■ As an evidentiary matter, a district court might properly consider the mailing of a suit letter and the receipt showing proper delivery as prima facie evidence that the notice had reached the addressee. Where, however, it is shown that the claimant through no fault of his own has failed to receive the suit letter, and the district court has so found, as in this case, the delivery of the letter to the mailing address cannot be considered to constitute statutory notification.

■ Our conclusion that Franks' Title VII is not barred does not end the matter, for special limitations considerations apply to that aspect of the Title VII action which seeks back pay. First, the proper limitations statute must be selected and applied. Under the borrowing principle of Beard v. Stephens, 5th Cir. 1967, 372 F.2d 685, when an action is brought for back pay or similar damages under a federal statute which contains no built-in limitations period, the federal district court must apply the statute of limitations of the state where it sits which would be applicable to the most closely analogous state action. The instant case was brought in a Georgia federal court. We have held in a recent case that the Georgia statute governing a back pay award in a § 707 pattern or practice suit brought by the Attorney General or in a § 706 private action such as the instant one, is Ga.Code § 3–704,[7] which prescribes a two-year limitations period for actions to recover wages, overtime, and damages due under statutes respecting the payment of wages. United States v. Georgia Power Company, 5th Cir. 1973, 474 F.2d 906, 924. Under the *Georgia Power* case, then, it is clear that the two-year statute applies.

■ For Franks' individual claim the statute began running on the date of his dismissal May 10, 1968. The running of the limitations period was tolled by the filing of a complaint with the EEOC on May 13, 1968, three days later, and it remained tolled "during such time as the processes of agency reconciliation are at work and until notification to the complainant that voluntary compliance cannot be obtained." United States v. Georgia Power Co., *supra* at 925. As we have indicated above, the notification was not ultimately made until the second suit letter was received on April 14, 1971. On this date the limitations period began running again and continued to run for twenty-one days, until suit was filed on May 5, 1971. Thus the limitations period ran for a total of less than one month, far less than the two year limitations period, before the suit was filed.

Under the same borrowing principle of Beard v. Stephens, *supra,* we conclude that Ga.Code § 3–704 applies to Franks' action under § 1981. The first sentence

---

7. Section 3–704 reads in pertinent part:
 All suits for the enforcement of rights accruing to individuals under statutes, acts of incorporation, or by operation of law, shall be brought within 20 years after the right of action shall have accrued: Provided, however, that all suits . . . for the recovery of . . . wages and overtime, subsequent to March 20, 1943, shall be brought within two years after the right of action shall have accrued.

of that section providing a twenty-year period for "all suits for the enforcement of rights accruing to individuals under statutes . . . ", plainly did not bar Franks' § 1981 action. The proviso of the § 3–704 prescribing a two-year period for suits to recover wages applies to the § 1981 action in the same way as to the Title VII action. The running of the limitations period was tolled during the period between the filing of the May 13, 1968 complaint with the EEOC and the receipt of the second suit letter on about April 14, 1971.

■ One further matter relating to the time suit was filed remains to be considered, and that is the applicability of the doctrine of laches. Title VII empowers the federal district court to

enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include . . . reinstatement or hiring of employees, with or without back pay. . . .

§ 706(g), 42 U.S.C.A. § 2000e–5(g). Thus, the action and the relief authorized are essentially equitable in nature. This is true not only of traditional injunctive relief which may be granted, but also of the back pay award.

The demand for back pay is not in the nature of a claim for damages, but rather is an integral part of the statutory equitable remedy, to be determined through the exercise of the court's discretion, and not by a jury.

Johnson v. Georgia Highway Express, Inc., 5th Cir. 1969, 417 F.2d 1122. The § 1981 action, insofar as it corresponds to the Title VII action, must also be considered essentially equitable. In an equitable action, equitable defenses may be raised, and these include the doctrine of laches. In the proper case, laches might be applied to bar a claim entirely, or it might bar only part of the remedy

sought, such as the back pay award or a portion of it. See United States v. Georgia Power Co., supra at 923. We do not intimate any view as to the applicability of laches to this case, for the district court should make such a determination in the first instance.

■ Our holding that Franks' individual claim was not barred by limitations necessitates reversal of that portion of the district court's judgment dismissing it. Since the question of Franks' tardiness in initiating suit was called to the attention of the district court, on remand it should specifically consider the applicability of laches.[8] Subject to its determination as to the applicability of the doctrine of laches, the district court should enter judgment for Franks and fashion an appropriate remedy, since it has already found that he established the factual bases of his claim.

II. Lee's Individual Claim: Significance of Arbitration Award

Lee, a Negro with seven years' experience as a truck driver and an excellent driving record, originally applied to Bowman for a driving job in January of 1970, but he was not hired, the district court found, because of his race. Upon learning that a white driver had been hired shortly after his rejection, Lee filed a complaint with the EEOC on February 26, 1970, charging a racially discriminatory refusal to hire. In response to the charge and to pressure from the Office of Federal Contract Compliance, Lee was hired on September 18, 1970 at the Birmingham terminal as one of Bowman's first black over-the-road truck drivers.

After working as a model employee for several months, Lee was discharged on March 18, 1971. The facts surrounding his discharge have been in dispute throughout this litigation. When Lee brought his truck to the Bowman garage

8. Appellants contend that the issue was not adequately raised below. When the issue of tardy filing was brought sufficiently to the attention of the court to be the ground for its ruling, however, we think it must be considered to have been adequately raised.

which serves the Birmingham area, a "stinger" was found in the fuel pump of his engine. A stinger is a wooden peg used to override the engine's governor, the device which limits the maximum revolutions per minute and thereby the truck's maximum speed. Bowman claims that it discharged Lee because of the stinger in his truck's engine under a firm, long-standing company policy requiring discharge of any employee whose fuel pump has been altered. Lee denies any fuel pump tampering and stresses the opportunities of others, including Bowman's white mechanics, to plant the stinger for reasons of racial prejudice.

Lee's discharge was submitted to binding arbitration under contractual grievance procedures and on October 25, 1971 an award favorable to Lee resulted. The arbitrator found that although the "facts raise[d] a strong inference approaching a presumption in the Company's favor," there was a "failure of proof" because the possibility of fuel pump tampering by other employees was not adequately eliminated. Reinstatement and back pay for one month, the maximum allowable under the collective bargaining agreement, were ordered. Bowman sent the back pay to Lee, and tendered reinstatement in his old Birmingham-based job on October 29, 1971. Lee refused to accept reinstatement at Birmingham, however, and demanded a transfer to Atlanta and back pay for all months from the time of his discharge. Bowman refused to comply with these demands, and the district court found that this refusal was not racially motivated.

Independently of the grievance procedures under the collective bargaining agreement Lee filed a second complaint with the EEOC on March 19, 1971, charging a discriminatory discharge. Lee's first EEOC charge, it will be recalled, was for the discriminatory refusal to hire. On June 22, 1971, Lee received a suit letter authorizing a Title VII action because of the discriminatory refusal to hire, and on July 12, 1971, he received another suit letter with respect to the alleged discriminatory discharge. He filed a timely motion to intervene in Franks' suit and was subsequently permitted to intervene on behalf of himself individually and other similarly situated black Bowman employees and job applicants. Lee's complaint invoked the court's jurisdiction under both Title VII and § 1981, as did Franks' original complaint.

The district court found for Lee with regard to the original refusal to hire and awarded him a total of $6,124.58 in back pay. No appeal is taken from this part of the district court's judgment.

In view of the undisputed fact that a stinger was found in Lee's truck and in light of Bowman's mandatory discharge policy for fuel pump tampering, the district court found that Lee failed to prove his discharge was racially motivated. On the basis of the evidence before it, it determined:

> The mandatory discharge rule for alteration of the fuel pump is one of long-standing. Between 1967 and trial, there were some 30 terminations or permitted resignations for violation of this rule. Some of the discharged drivers had received prior warnings for violations or other company rules not leading to mandatory discharge; but some, like Lee, had no prior warnings and possessed clean records at the time. There was no requisite of previous offense to the discharge. Most significantly, there is no indication and no evidence that any other driver, Black or white was ever NOT discharged for violation of the standing rule. It is concluded that race was not a factor in the discharge of the intervenor Lee.

Appellant Lee challenges as clearly erroneous the district court's finding that the discharge was not racially discriminatory. Although the facts surrounding the discovery of the stinger leave ample room for suspicion that the fuel pump was altered by another employee besides Lee, on the record before us we cannot

hold the district court's determination clearly erroneous.

The primary basis for Lee's factual attack is his contention that the district court erred in failing to give greater weight to the arbitration award in his favor in making its findings.[9] We cannot agree. The federal court is the final arbiter in cases involving Title VII rights, and "the arbitrator's determination under the contract has no effect on the court's *power* to adjudicate a violation of Title VII rights." Hutchings v. United States Industries, Inc., 5th Cir. 1970, 428 F.2d 303, 313 (emphasis in original). Invoking contractual grievance procedures does not constitute an election of remedies which automatically bars a Title VII claimant from the court, and an arbitration award cannot be pleaded as a defense to a Title VII suit under the doctrine of res judicata. *See id.* at 314; Rios v. Reynolds Metals Co., 5th Cir. 1972, 467 F.2d 54; Bowe v. Colgate-Palmolive Company, 7th Cir. 1969, 416 F.2d 711, 715.

To be sure, arbitration awards and grievance determinations "may be properly considered as evidence" in a Title VII case to the extent they are relevant to the questions before the court. Hutchings v. United States Industries, Inc., *supra* at 314 n. 10. And when the same issues are presented in arbitration as in a Title VII lawsuit, the court has discretion under certain circumstances to defer to the award, just as the National Labor Relations Board may in a case properly before it defer to an arbitrator's determinations. *See* Lodge No. 12, District No. 37, International Association of Machinists v. Cameron Iron Works, Inc., 5th Cir. 1958, 257 F.2d 467, 473. We have recently had occasion to delineate in some detail the circumstances under which such discretionary deference by a court is proper:

We hold that the federal district court in the exercise of its power as the final arbiter under Title VII may follow a like procedure of deferral [i. e., a procedure like that of the NLRB] under the following limitations. First, there may be no deference to the decision of the arbitrator unless the contractual right coincides with rights under Title VII. Second, it must be plain that the arbitrator's decision is in no way violative of the private rights guaranteed by Title VII, nor of the public policy which inheres in Title VII. In addition, before deferring, the district court must be satisfied that (1) the factual issues before it are identical to those decided by the arbitrator; (2) the arbitrator had power under the collective bargaining agreement to decide the ultimate issue of discrimination; (3) the evidence presented at the arbitral hearing dealt adequately with all factual issues; (4) the arbitrator actually decided the factual issues presented to the court; (5) the arbitration proceeding was fair and regular and free of procedural infirmities.

Rios v. Reynolds Metal Company, *supra* at 58.

In this case it is clear that complete deference to the arbitration award would have been improper. The contractual issue presented to the arbitrator was whether the company proved, under a "strict proof" standard, that Lee had tampered with the fuel pump, and not whether the discharge was for racial reasons. The contractual right not to be dismissed unless "cause" could be demonstrated was not identical to the Title VII not to be discharged for reasons of race. Further, the arbitrator's finding could be of little if any evidentiary value. A finding that the stinger in the fuel pump was not Bowman's real reason for discharging Lee would have had an important bearing on the question of racial motivation presented to the court, but the arbitrator made no

9. The district court concluded: "The court is not bound by the arbitration award in any way. . . . This is especially true where race was given no consideration by the arbitrator."

such finding. Rather, the arbitrator found only that the company failed to prove fuel pump tampering, and did not deal with Bowman's motivation. In arriving at this finding, the arbitrator imposed on the company the burden of proof, and it evaluated the evidence under a "strict" standard of proof, under which "reasonable doubts should be resolved in favor of the grievance." Thus, in the final analysis, the arbitrator determined only that the company's asserted basis for the discharge—that Lee had tampered with the fuel pump—was not demonstrated beyond a reasonable doubt. This finding could be of little value to Lee in carrying his burden of proving racial motivation at trial or to the district court in resolving the factual issues before it. It did not err or abuse its discretion in failing to give greater weight to the arbitration award.

Accordingly, the judgment of the district court insofar as it relates to Lee's individual claim is affirmed.

### III. Adequacy of Relief to the Class

Appellants argue that the record in this case calls for further affirmative relief to the class of discriminatees, beyond that granted in the injunction of the district court. Specifically, they seek (1) allowance of full company seniority for employees who have been discriminated against, (2) the temporary use of a mathematical formula to ensure the hiring of more black over-the-road drivers in the future and the ordering of public recruitment for black over-the-road drivers and for black office workers, (3) mandatory training programs to upgrade the skills of black employees and applicants, and (4) retention of jurisdiction by the district court to ensure compliance. Additionally, appellants contend the district court abused its discretion in refusing to award back pay to non-named class members. We are compelled to agree that further relief in some respects is required, as we indicate below.

### A. Bowman's Operations and Policies

Bowman is an interstate trucking business with its main terminals located in Atlanta, Birmingham, Charlotte, and Richmond. Its employees fall into four categories: (1) the over-the-road (OTR) drivers, (2) city drivers and dock workers, (3) Maintenance Department workers (including employees in the Tractor Shop, the Trailer Shop, and the Tire Shop), and (4) office, sales, and clerical employees. Employees in the first three categories belong to the union, and the organizational lines separating them are established in the collective bargaining agreements between Bowman and the union. The office and clerical employees are not unionized, but, the district court found, "in essence [they] constitute another department at each terminal." The OTR drivers are the long-distance truck drivers; they number four hundred to five hundred company-wide, and they earn the highest wage paid to non-management employees. The city drivers, of whom about fifty are employed at the Atlanta terminal, drive trucks on local missions at the respective terminals, and the one hundred fifty to two hundred dock workers perform the manual labor of loading and unloading trucks. The city drivers and dock workers are at the middle of the wage scale. Within the Maintenance Department, which has about one hundred twenty employees in Atlanta, the jobs in the Tire Shop require the most menial work and bring the lowest pay, while the Tractor Shop and the Trailer Shop jobs require mechanical skill and pay more. Each terminal is a hiring center for OTR drivers, who operate system-wide, as well as for other categories of employees, whose work is localized at the terminal. In its class aspects, this suit involves all OTR drivers throughout Bowman's system, and employees in the other three categories at the Atlanta terminal only.

Before 1968 Bowman followed a conscious policy of keeping its employees

segregated according to race. With the exception of two black "cleanup men" in the Trailer Shop, blacks were employed only in the Tire Shop.[10] This was the only subdivision into which blacks were hired, and transfer to other shops within the Maintenance Department or to other departments was not permitted. The Tire Shop had predominantly black employees and white supervisors. Since August 1968 Bowman has hired a few blacks into the previously all-white OTR and City Driver and Dock Departments, but as of the time of trial in March of 1972 it had not hired any blacks into the higher paying mechanic jobs in the Maintenance Department or as office or clerical workers.

Before 1967 Bowman prohibited interdepartmental transfers flatly. The collective bargaining signed in 1967 eliminated Bowman's no-transfer policy and opened the way for nonracial hiring in all departments, but the agreement

10.

The district court found that the following chart represented accurately the distribution of jobs according to race at the times indicated:

| Dept./Job | July, 1965 Blacks–Whites | | March, 1968 Blacks–Whites | | August, 1971 Blacks–Whites | |
|---|---|---|---|---|---|---|
| Office & Managerial | 0 | 23 | 0 | 27 | 0 | 42 |
| Sales Personnel | 0 | 6 | 0 | 5 | 0 | 5 |
| Office/Clerical | 0 | 27 | 0 | 63 | 0 | 53 |
| Ship Parts Clerk | 0 | 8 | 0 | 9 | 0 | 9 |
| Over-the-Road Drivers | | | | | | |
| Atlanta Terminal | 0 | 360 | 0 | 361 | 0 | 230 |
| All Other | 0 | 55 | 0 | 103 | 11 | 269 |
| TOTAL | 0 | 415 | 0 | 464 | 11 | 499 |
| City Driver/ Dock Jobs | | | | | | |
| City Drivers | 0 | 79 | 0 | 80 | 3 | 81 |
| Checkers | 0 | 23 | 0 | 127 | 4 | 103 |
| Dock Workers | 0 | 84 | 0 | 94 | 6 | 60 |
| TOTAL | 0 | 186 | 0 | 301 | 13 | 244 |
| Shop Workers | | | | | | |
| Mechanics | 0 | 70 | 0 | 92 | 0 | 63 |
| Trailer Shop | – | – | – | – | 0 | 36 |
| Grease/Oil Men | 0 | 6 | 0 | 8 | 0 | 4 |
| Tire Shop | 7 | 1 | 9 | 3 | 16 | 2 |
| Clean-up Men | – | – | 1 | 1 | 4 | 0 |
| Janitors | 0 | 1 | 0 | 2 | 1 | 1 |
| TOTAL | 7 | 78 | 10 | 106 | 21 | 106 |
| **TOTAL EMPLOYEES** | 7 | 743 | 10 | 1025 | 45 | 958 |

continued to recognize departmental seniority. The district court found that the maintenance of the departmental seniority "effectively penalized any Senior Blacks wishing to transfer to a previously all-white department in favor of junior whites already employed there."

The first black was hired into the previously all-white City Driver and Dock Department on August 15, 1968.

Despite the collective bargaining agreement provision mandating hiring without regard to race, Bowman maintained until September of 1970 a conscious unwritten policy of not hiring blacks as OTR drivers. The apparent source of the resistance to change in this department was the unwillingness of the white drivers to "ride double" with blacks to train them for the job or to share bunk and shower facilities with them on the road. In 1970 the company began receiving greater numbers of applications from blacks for OTR jobs. Under pressure from the Office of Federal Contracts Compliance to hire OTR drivers without regard to race, and partly in response to the EEOC charge filed by appellant Lee, Bowman hired its first OTR driver on September 11, 1970. For about a year black OTR drivers were hired only at the Birmingham terminal, where Bowman housed them in separate facilities. Other black OTR drivers were first hired in Richmond on September 12, 1971, in Atlanta on November 21, 1971, and in Charlotte on February 15, 1972. The record reflects that Bowman has been hiring black OTR drivers at a sharply decreasing rate since the first hirings in September of 1970 under pressure. During the last four months of 1970, ten of the thirty-six new OTR drivers hired, or 28%, were black. During the twelve months of 1971, thirteen of one hundred one, or 12%, of the new OTR drivers were black. In the first two months of 1972, immediately before trial, Bowman hired fifty OTR drivers, only four of whom, or 8%, were black. On February 26, 1972, one month before trial 3.3% of the total number of OTR drivers employed by Bowman were black.[11]

The provision of the 1967 collective bargaining agreement abolishing the no-transfer rule and requiring hiring without regard to race has had no effect in the Maintenance Department. Bowman has never hired a black mechanic in the Tractor Shop or in the Trailer Shop, either "off the street" or as a transfer from the Tire Shop. Bowman has not hired a black as a "grease man" since that position became a training step to the mechanic positions. When blacks have attempted to transfer from the Tire Shop to better jobs in the maintenance Department, management has discouraged the move by informing the transfer-aspirant that he must resign for a period of six weeks and then reapply, or simply that transfers are not permitted. Further, although any Maintenance Department employee may theoretically use his full departmental seniority in bidding on any Maintenance Department job, inter-shop transfer attempts by seniority bidding are largely prevented by the expedient of posting job openings only in the shop where they occur, so that employees in the other shops remain ignorant of them. For example, an opening in the Tractor Shop would be posted only in the Tractor Shop area, so that Tire Shop employees with seniority would not become aware of it and thus have a meaningful opportunity to bid for it.

At the time of trial Bowman had never hired a black office worker at the Atlanta terminal. Clerical job vacancies

11. The 3.3% figure is taken from a seniority list supplied by Bowman shortly before trial. The district court found that "some 10%" of the OTR drivers were black at the time of trial, but it did not indicate the source of this later statistic. Finding no basis in the record for the 10% figure, we believe it must be the result of an oversight, and we accept appellants' unanswered contention that it is clearly erroneous. In the absence of some evidence showing a drastic increase in the percentage of black OTR drivers in the last month before trial, the figure must be considered to have been about 3.3% at the time of trial.

are not advertised publicly, but are communicated by current clerical employees to acquaintances by word of mouth. Only three or four blacks applied for clerical positions in the five years preceding trial. Until spring of 1971 Bowman used the race-oriented Wonderlic test to screen clerical job applicants and it rejected two black applicants on the basis of the scores obtained.[12]

The district court found that Bowman had not practiced racial discrimination in hiring office and clerical workers.[13] With regard to the OTR drivers, dock workers and city drivers and Maintenance Department employees, it found that, while discriminatory policies had existed in the past, they had, by the time of trial, given way to "an official policy against discriminatory hiring in all of its [Bowman's] hiring practices." The departmental seniority system, however, perpetuated the effects of past discrimination.

## B. Relief Granted by the District Court

The district court's order defining the classes represented and granting injunctive relief reads as follows:

In accordance with the findings of the Court, the defendant, BOWMAN TRANSPORTATION COMPANY, and the defendants, INTERNATIONAL UNION OF DISTRICT 50, LOCAL NO. 13600, ALLIED AND TECHNICAL WORKERS OF THE UNITED STATES AND CANADA and INTERNATIONAL UNION OF DISTRICT 50, ALLIED AND TECHNICAL WORKERS OF THE UNITED STATES AND CANADA, their officers, agents, employees, servants, and all persons in active concert or participation with them, are hereby permanently *enjoined* and *restrained* from discriminating against any Black applicant or Black employee of the defendant, Bowman Transportation Company at its Atlanta Terminal or elsewhere for over-the-road drivers in violation of Title VII of the Civil Rights Act of 1964.

The defendants are enjoined from implementing a seniority system which would interfere with the rights under this judgment of black employees in the classes herein defined.

AFFECTED CLASSES.

The affected classes are defined by the court as follows:

CLASS 1. All Black employees at the Atlanta Terminal who were hired prior to August 15, 1968.

CLASS 2. All Black employees employed at the Atlanta Terminal in the Maintenance Department prior to May 1, 1970.

CLASS 3. All Black applicants who applied for positions as over-the-road drivers prior to January 1, 1972.

CLASS 4. All Black employees who applied to transfer to over-the-road drivers positions prior to January 1, 1972.

---

12. The use of the Wonderlic test to screen job applicants was held to constitute prohibited racial discrimination in Griggs v. Duke Power Co., 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 because it yielded significantly different results for whites and blacks and was not shown to produce job-related information. Bowman has made no attempt to show that the Wonderlic test results were related to the requirements of its clerical jobs.

13. The district court's findings with regard to the office and clerical workers were as follows:

The office employment situation stays rather stable and although there is a sub-stantial number of applicants each year, the hiring rate is very low. In the past five years, there have only been a total of three or four Black applicants out of an average of 25 each year. Each of these applicants has been treated no differently from any other applicant and race has not been a factor in the employment policies in the office. At time of trial, one Black applicant has been deemed qualified and is waiting for an opening. There simply has been little interest by Blacks in clerical positions at this company and no evidence is produced of racial discrimination in this department.

ORDERS.

*The members of CLASS 1* have all been restricted to jobs in the Tire Shop prior to August 15, 1968, by the racially discriminatory policies of the defendant company. Hereafter any member of the affected class who competes with a non-member in a bid to transfer or be promoted within the company shall be entitled to compete on the basis of company seniority until such date plus any departmental seniority thereafter, rather than departmental seniority only.

*The members of CLASS 2* have been restricted to jobs in the Tire Shop and prevented from transferring to the Tractor and Trailer Shops within the Maintenance Department by the racially discriminating policies of the defendant company. All such members shall be notified of the right to bid within the department at the next annual bidding. If bids are lodged and the member is deemed qualified, he shall thereafter be credited with departmental seniority from the date of original employment in all future bidding.

*The members of CLASS 3* have been effectively denied employment as over-the-road drivers prior to January 1, 1972. All Black applicants as revealed by the company records prior to such date shall be notified in writing of their right to be considered for employment by the company within 30 days and given 30 days thereafter to indicate their interest. If consideration is requested, then they shall be afforded priority in consideration over all other applicants until each such applicant, in chronological order, has been accepted or rejected by the company. Two applicants, Harbor and McLoughlin, shall be considered within 15 days by the company. In any such applications, race shall not be used by the company as a means of denying employment to any applicant.

*The members of CLASS 4,* who sought to transfer from a job as "city driver" or elsewhere to road driver shall likewise be afforded priority in consideration for such employment in chronological order along with the members of CLASS 3.

A copy of this order, or such substituted order as agreed upon by counsel, shall be posted in a conspicuous place in each department and sub-department of the Defendant, Bowman Transportation Company's Atlanta Terminal and in the office of each terminal and warehouse of the Defendant elsewhere for the period of 60 days. In addition, all bids shall hereafter be posted in each sub-department and shop in the Atlanta Terminal.

The court's conclusions of law indicate that Franks represented the first two of the "affected classes" and Lee represented the second two. Analytically, a fifth class is implicit in the first paragraph of the district court's order—the class of all black job applicants and employees of Bowman. The four enumerated categories may be considered subclasses within this larger class. Their apparent purpose is to delineate the groups which the district court concluded were entitled to a special affirmative remedy, beyond the general prohibition against future discrimination. August 15, 1968, the date used to define class 1, is the day the first black dock worker at the Atlanta terminal was hired. The district court evidently found that the discrimination barrier which excluded blacks from employment in the City Driver and Dock Department wholly dissolved on that day. The dates used to define the remaining classes are not tied to concrete events in the record; it appears that the district court believed discrimination in the relevant areas ceased on approximately the days indicated. Although appellants cast their arguments in terms of remedy, and do not directly assail the definition of the classes, or subclasses, and although we shall is the remainder of this opinion speak in terms of remedies, it is clear that modifications in the remedy afforded could necessitate re-

drawing to some extent the classes. Where appropriate, such redrawing should be performed on remand. *See* Johnson v. Georgia Highway Express Co., 5th Cir. 1969, 417 F.2d 1122, 1124.

### C. Standard of Review

The power of the district court to fashion an equitable remedy is broad:

> Once a right and a violation have been shown, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

Swann v. Charlotte-Mecklenburg Board of Education, 1971, 402 U.S. 1, 15, 91 S. Ct. 1267, 1276, 28 L.Ed.2d 554. Generally, the exercise of this equitable discretion will be disturbed on appeal only for an abuse of discretion.

■ The limits of the district court's discretion are marked by its duty to carry out within practicable limits the purpose of Title VII, which is to make the discriminatee whole and to remedy the effects of past discrimination. Vogler v. McCarty, Inc., 5th Cir. 1971, 451 F.2d 1236, 1237; *cf.* Louisiana v. United States, 1965, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709. To accomplish this end, the district courts are not "limited to simply parroting the Act's prohibitions." Local 53 of International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, 5th Cir. 1969, 407 F.2d 1047, 1052. Rather they should order "such affirmative action as may be appropriate." § 706(g) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–5(g). If an appellate court can determine from the record that the relief granted is not sufficient to make the discriminatee whole as far as possible, then the district court's order falls outside the bounds of its discretion. For some recurrent problems, we have had occasion in previous cases to discuss the minimum appropriate remedy, and such cases provide more specific limits and guidelines for the exercise of discretion. *See, e. g.,* Local 189, United Pa-

permakers and Paperworkers, AFL–CIO, CLC v. United States, 5th Cir. 1969, 416 F.2d 980, cert. denied 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (seniority relief).

### D. Asserted Inadequacy of the District Court's Decree

#### 1. Seniority Relief

The district court's order allowed members of class 1 (all present black employees at the Atlanta terminal who were hired before August 15, 1968) to compete for jobs on the basis of company seniority accumulated before August 15, 1968, the date the first black dock worker was hired, and departmental seniority accumulated thereafter. Appellants characterize this aspect of the decree as "halfway seniority relief." They contend (1) that members of class 1 should be allowed to use company seniority accumulated after as well as before August 15, 1968, (2) that members of class 4 (present Bowman employees who applied to transfer to OTR positions before January 1, 1972) who are hired as OTR drivers pursuant to the court's decree should be able to use company seniority for all purposes in the OTR Department, and (3) that members of class 3 (pre-January 1, 1972 black OTR applicants) who are hired pursuant to the court's decree should be awarded constructive OTR departmental seniority beginning on the date they would have been hired but for the discrimination.

■ When a departmental seniority system perpetuates the effect of past discrimination it is an unlawful employment practice proscribed and remediable under Title VII. *E. g.,* United States v. Bethlehem Steel Corporation, 2nd Cir. 1971, 446 F.2d 652; Robinson v. Lorillard Corp., 4th Cir. 1971, 441 F. 2d 791, cert. dismissed 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655; Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States, *supra*; Quarles v. Philip Morris, Inc., E.D.Va. 1968, 279 F.Supp. 505. Though not as drastic as a rigid no-transfer rule, a de-

partmental seniority system discourages transfers and thereby locks a discriminatee into his inferior job by threatening him with loss of his accumulated seniority if he should transfer. "In any industry loss of seniority is a critical inhibition to transfer." United States v. Jacksonville Terminal Co., 5th Cir. 1971, 451 F.2d 418, 453, cert. denied 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815. That the system is racially neutral on its face does not save it under Title VII if its effect is to "cut into the employees' present right not to be discriminated against on the ground of race." Local 189 supra at 988; see also United States v. Jacksonville Terminal Co., supra at 451. The federal courts' power to modify or suspend the operation of a discriminatory seniority system is not affected by the fact that the seniority system has been established in a private, collective bargaining agreement. Vogler v. McCarty, Inc., 5th Cir. 1971, 451 F.2d 1236. The only ground upon which a discrimination-perpetuating seniority system may be defended is that of business necessity. "When a policy is demonstrated to have discriminatory effects, it can be justified only by a showing that it is necessary to the safe and efficient operation of the business." Jones v. Lee Way Motor Freight, 10th Cir. 1970, 431 F.2d 245, 249; see Robinson v. Lorillard Corp., supra at 797; Local 189, supra.

In this case it is undisputed that the members of class 1 were originally relegated to inferior jobs in the Tire Shop as a result of Bowman's racially discriminatory hiring practices. Further, it is clear that the departmental seniority system has the forbidden effect of locking discriminatees into the pattern thus created. Neither Bowman nor the union has attempted to defend the seniority system as a "business necessity." As the district court recognized, class 1 members are entitled to relief from the

locking-in effect of the departmental seniority system. The question presented is what form the remedy must take and how far it must go.

The leading case in this circuit on seniority relief under Title VII is Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States, 5th Cir. 1969, 416 F.2d 980, cert. denied 1970, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100, aff'g, E.D.La.1969, 301 F.Supp. 906. There, Judge Wisdom endorsed for our Court the "rightful place" [14] approach to seniority problems.

A "rightful place" theory stands between a complete purge of "but-for" effects [and] maintenance of the status quo. The Act should be construed to prohibit the future awarding of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their present positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation.

Id. at 988. He concluded that the decree entered by the district court in that case accorded with the rightful place interpretation of the Act. That decree "permanently abolished" the offending "job seniority system" and allowed discriminatees to compete for jobs on the basis of "mill seniority," which was to be computed from the beginning of the employee's service at the mill, regardless of the job slot he occupied, up to the date of his bid. United States v. Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC, E.D.La.1969, 301 F.Supp. 906, 919.

In United States v. Jacksonville Terminal Co., 5th Cir. 1971, 451 F.2d 418, cert. denied 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815, we applied the Local 189 principles and found that the

---

14. The "rightful place," "freedom now," and "status quo" theories were first distinguished and analyzed in Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967).

"craft and class" seniority system at issue in that case was a discriminatory unlawful employment practice under Title VII. We held that an appropriate remedial decree should grant to discriminatees "qualified to fill vacancies . . . the right to bid for . . . positions on the basis of Terminal seniority (time worked for the employer) rather than craft or class seniority." *Id.* at 454. In laying down guidelines which the decree should follow, we specified that discriminatees should be allowed to use Terminal seniority "until they successfully bid for, and retain after any on-the-job probationary or training period (if required), positions outside the craft or class which they occupy at the time of the District Court's decree." *Id.* at 458–459.

In United States v. Bethlehem Steel Corp., 2nd Cir. 1971, 446 F.2d 652, the Second Circuit established similar guidelines. Disapproving a discrimination-perpetuating departmental seniority system, it allowed discriminatees to transfer with seniority carryover "only once, and only during the next two years." *Id.* at 666. This once-only, two-year limitation was considered adequate to allow the discriminatee an adequate opportunity to break out of the racial pattern while not giving him a preferential advantage or imposing an unneccessarily unstable situation on the employer:

> Because a transferee will have only one opportunity of limited duration to transfer to a formerly "white" department, the Lackawanna plant will not be thrown into a chaotic game of musical chairs. . . . Nor will any employee have superseniority.
> . . .

*Id.* at 666.

In each of these cases the court has allowed discriminatees to use full company seniority to compete for job openings for at least a reasonable time after the entry of the court's decree. In *Local 189* the discriminatory system was "permanently abolished" and mill seniority substituted for discriminatees, presumably also permanently. In *Jacksonville Terminal* discriminatees could use company seniority for transfer purposes only once but the use might possibly be delayed for a lengthy period. In *Bethlehem Steel* the court imposed a one-time or two-year limitation on discriminatees' right to transfer with full seniority carryover.[15]

 Both the precedents and the nature of the wrong, we think, indicate that the remedy afforded by the district court should allow to employees locked into old racial patterns by the departmental seniority system the use of full company seniority for transfer purposes for a reasonable time and for all purposes after transfer in the new department. The locking-in effect of departmental seniority on present employees does not cease as of the date that discrimination as to new hires ceases. To allow for purposes of transfer—*i. e.* bidding on a new job in a different department—the use of company seniority accumulated only up to the date on which discrimination in hiring at the terminal ceased in the past would force discriminatees to compete with non-discriminatees on an unequal footing in the present. To permit only partial seniority carryover would only reduce the penalty which a discriminatee would suffer by transferring, but would not eliminate it. The district court's decree should dissolve the barrier to transfers completely by allowing the use of full company seniority. Pettway v. American Cast Iron Pipe Co., 5th Cir. 1974, 494 F.2d 211 [No. 73–1163, Apr. 29, 1974]. Further, the discriminatee should be allowed a reasonable time for using company seniority to escape the racial patterns creat-

---

15. Compare Quarles v. Philip Morris, Inc., E.D.Va.1968, 279 F.Supp. 505, where the court required a prompt declaration of interest by discriminatees and prompt screening to identify those who would be able to bid on the basis of company seniority, but designated no cut-off date in the future after which those discriminatees would no longer be able to use company seniority.

ed in the past. The right of the discriminatee to transfer with seniority carryover on the basis of company seniority need not be extended indefinitely into the future, but a reasonable time after the entry of the decree must be allowed.[16]

This same reasoning applies to members of class 4 (black employees who applied to transfer to OTR positions prior to January 1, 1972) as well as other pre-January 1, 1972 black employees who were excluded from OTR jobs at the time of their original employment. Those who are found qualified for OTR jobs should be allowed to bid for them on the basis of company seniority and should not be penalized for accepting them by loss of all or a portion of their accumulated company seniority. They should be allowed to carry over accumulated company seniority for all purposes in the OTR department.[17] United States v. Bethlehem Steel Corp., *supra*.

In treating questions of seniority here, we do not, of course, suggest that Bowman must hire without regard to qualification. "Secretaries must be able to type. There is no way around that necessity." *Local 189, supra* at 989. And truck drivers must be qualified to drive. But transfer applicants must be accepted or rejected, as the district court's decree requires, on the basis of valid, nonracial criteria.

In seeking application-date seniority for members of class 3 (black applicants who applied for OTR jobs before January 1, 1972) appellants ask us to take a giant step beyond permitting job competition on the basis of company seniority. They ask us to create constructive seniority for applicants who have never worked for the company. Granting that the black OTR applicants who were rejected on racial grounds suffered a wrong, we do not believe that Title VII permits the extension of constructive seniority to them as a remedy. Section 703(h) of Title VII, 42 U.S.C.A. § 2000e–2(h), provides:

> Notwithstanding any other provision of this title it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin.

The discrimination which has taken place in a refusal to hire does not affect the bona fides of the seniority system. Thus, the differences in the benefits and conditions of employment which a seniority system accords to older and newer employees is protected as "not an unlawful employment practice." Facing this problem in *Local 189,* Judge Wisdom wrote:

> It is one thing for legislation to require the creation of *fictional* seniority for newly hired Negroes, and quite another thing for it to require that time *actually worked* in Negro jobs be given equal status with time worked in white jobs. . . . [C]reating fictional employment time for newly-hired Negroes would constitute pref-

---

16. We believe a one-transfer-only limitation would be reasonable also, either in conjunction with or in addition to the time limitation, since the discriminatee stands on a substantially equal footing with his white contemporaries once he has escaped the confines of the racial pattern in which he has been trapped.

17. In Bing v. Roadway Express, Inc., 5th Cir. 1973, 485 F.2d 441, we dated seniority for transferring road drivers from the date of qualification. In that case, Roadway had a flat requirement of one year's experience for road drivers, so that the qualification date was easily calculable. To allow the use of company seniority before that date would have placed the discriminatee in a better position than he could have achieved *without* the discrimination. In this case, by contrast, Bowman had no rigid one-year experience requirement. It sometimes accepted OTR trainees with little or no prior driving experience.

erential rather than remedial treatment.

. . . . . .

No stigma of preference attaches to recognition of time actually worked in Negro jobs as the equal of white time . . . We conclude . . . that Congress exempted from the anti-discrimination requirement only those seniority rights which gave white workers preference over junior Negroes.

*Local 189, supra* at 995. We are guided by his reasoning here. The district court did not abuse its discretion in refusing to create constructive seniority for black OTR applicants who were rejected as a result of Bowman's discriminatory policy.

In conclusion, we agree with appellants' contention that present Bowman employees who have been discriminated against in the past and remain locked-in to the racial pattern by departmental seniority must be allowed to compete for jobs in other departments on the basis of full accumulated company seniority, and that this remedy should be made available for a reasonable time to permit them to take advantage of it. On remand the decree should be modified in accordance with these views. We do not agree that constructive seniority may be created and awarded to those who are not employees.

### 2. Affirmative Hiring Relief

Appellants next contend that the District Court's decree was deficient in failing to provide (1) that Bowman must conduct an active recruitment campaign designed to attract black OTR applicants and must hire one black OTR driver for every new white OTR driver hired until twenty percent of the OTR drivers are black, and (2) that Bowman must actively recruit black office and clerical workers in a manner specifically designed to inform the black community of clerical job opportunities. Appellants included both of these measures in a proposed decree which they submitted to the District Court.

The record in this case shows that Bowman followed a conscious policy of excluding blacks from its OTR Department until September 1970, a time over five years after the effective date of the Civil Rights Act of 1964. The District Court found that Bowman, although aware of its legal obligations, intentionally continued to follow its discriminatory policy and put off hiring black OTR drivers as long as it could. It began hiring black OTR drivers in 1970 only under pressure from the OFCC and at least one EEOC complaint. As we have often observed, actions taken under such pressure and in the face of threatened or pending litigation are at best "equivocal in purpose, motive and permanence." Jenkins v. United Gas Corp., 5th Cir. 1968, 400 F.2d 28, 33; *see also* Rowe v. General Motors Corp., 5th Cir. 1972, 457 F.2d 348, even when they are drastic and go far toward remedying the effects of past discrimination. In this case, the sincerity and permanence of Bowman's conversion to nonracial employment practices are all the more dubious in light of the steadily declining rate at which Bowman has hired black OTR drivers after September of 1970 and in light of the small percentage (3.3%) of the OTR Department which was black at the time of trial.[18] Public recruitment has been granted previously as a remedy in racial-discrimination cases,[19] and we

18. *See* note 10, *supra*, & accompanying text.

19. Public recruitment aimed at blacks was held mandatory in United States v. Georgia Power Co., 5th Cir. 1973, 474 F.2d 906, 926 and in United States v. Sheet Metal Workers International Association, Local 36, AFL–CIO, 8th Cir. 1969, 416 F.2d 123, 139–140. It was also a part of the remedy granted in the following cases: United States v. Ironworkers Local 86, W.D.Wash. 1970, 315 F.Supp. 1202, aff'd 9th Cir. 1971, 443 F.2d 544, cert. denied 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367; United States v. Central Motor Lines, Inc., W.D.N.C.1971, 338 F.Supp. 532; United States v. United Association of Journeymen, etc., Local No. 73, S.D.Indiana 1969, 314 F.Supp. 160. The

agree with appellants that this case calls for such a remedy.

At the time the District Court entered its findings of fact, conclusions of law, and order and decree in March, 1972, it did not have the advantage of our *en banc* decision in Morrow v. Crisler, 5th Cir. 1974, 491 F.2d 1053. *Morrow* considered the precise charge made here: that the District Court failed to order sufficient affirmative relief. The *en banc* court there remanded for additional consideration where the events since the District Court decree indicated the initial relief to have been insufficient.

We would vacate so much of the District Court's decree as denies the request for additional affirmative relief and remand to the District Court to update the record in this case, which is now over two years old, and to consider what, if any, additional affirmative relief may be necessary in light of current facts and our decision in *Morrow*.

The hurdle which appellants must clear in order to be in a position to demand public recruitment of black office workers is the District Court's finding that Bowman does not discriminate in hiring office workers. We conclude that appellants have cleared this hurdle on the strength of their proof below that Bowman had never hired a black office worker, relied on word-of-mouth advertising to fill vacancies which became available, and followed patently discriminatory practices in connection with the employment of drivers by the Company.

The underlying findings upon which the District Court relied in making its no-discrimination finding were: (1) only three or four of the approximately twenty-five clerical applicants each year are black, (2) blacks have shown little interest in office jobs, and (3) black applicants are treated no differently than white applicants. Further pertinent facts appearing in the record, which are not disputed, are (4) that Bowman had never hired a single black office or cleri-

cal worker in Atlanta by the time of trial, and (5) Bowman did not publicize office job vacancies but relied on word-of-mouth advertising by the current all-white office staff.

The most vociferous figure regarding the office and clerical workers in this case is that Bowman's office staff was at the time of trial and had always been one hundred percent white. This statistic alone raises a question concerning racial discrimination in Bowman's hiring of office workers. See United States v. United Brotherhood of Carpenters and Joiners of America, Local 169, 7th Cir. 1972, 457 F.2d 210, 214; United States v. Hayes International Corp., 5th Cir. 1972, 456 F.2d 112, 120. It has not been shown to be the result of any business necessity, or extenuating circumstances, or any cause other than a preference for whites in hiring.

The suggestion that the all-white composition of the office staff is due to lack of interest on the part of blacks or the small number of black applicants is singularly unpersuasive in view of Bowman's heavy reliance on word-of-mouth recruiting. We recognized recently in United States v. Georgia Power Co., 5th Cir. 1973, 474 F.2d 906, 925, that when all current employees in a unit are white "word-of-mouth hiring alone would tend to isolate blacks from the 'web of information' which flows around opportunities at the company." Although this recruiting method is racially neutral in form, in practice it operates as a "built-in headwind" to blacks. *Id.*; Parham v. Southwestern Bell Telephone Co., 8th Cir. 1970, 433 F.2d 421; Clark v. American Marine Corp., E.D.La.1969, 304 F. Supp. 603, 606, 608. No business necessity for Bowman's exclusive reliance on this recruiting method has been shown or argued.

Inasmuch as the record is clear as to the discriminatory employment practices concerning drivers, we think that the above evidence was sufficient to carry

power of the court under Title VII to order, as a remedial measure, advertising and re-

cruitment efforts aimed at minority groups cannot be seriously questioned.

the plaintiff's burden of proof that discrimination in hiring office workers was sufficiently shown to justify some relief.

Under the circumstances of this case we agree with appellants that the District Court's failure to order some hirment to attract black office and clerking relief in the form of public recruitworkers, as well as to attract OTR applicants, was an abuse of discretion, and that advertising of office job vacancies through some medium designed to reach blacks would be appropriate.

We do not specify the precise form which such recruiting is to take. "[A]dvertisements of openings in newspapers and periodicals accessible to the black communities of Atlanta and other Georgia cities, and public notice that the company is an equal opportunity employer, are common recruiting techniques which should be considered. . . . We hold only that the present word-of-mouth practice must be supplemented or changed." United States v. Georgia Power Co., *supra*, at 926.

In summary, we conclude that this case warrants affirmative hiring relief for potential black OTR drivers in the form of public recruitment, consideration of additional affirmative relief in the light of our opinion in *Morrow*, and affirmative hiring relief for potential black office workers in the form of public recruitment. We leave to the District Court the task and prerogative of devising the particular form these remedies should take and of framing an appropriate decree.

### 3. Mandatory Training for Discriminatees

Appellants next ask that Bowman be ordered to establish special training programs to upgrade the skills of discriminatees and to facilitate their movement out of inferior jobs.

Bowman's record of denying training opportunities to blacks is bad. From 1968 to 1971 Bowman hired 75 to 150 white OTR drivers with no prior truck driving experience and trained them by assigning them to "ride double" with experienced drivers. At the same time, assertedly because of the racial prejudice of all its white drivers, similar training opportunities were denied blacks. Prior to August of 1968 blacks were absolutely excluded from city driver jobs, which may lead to qualification for OTR jobs. In the Maintenance Department, black Tire Shop employees have been denied access to jobs through which they might progress to mechanic position.

At a minimum, an effective remedy in this case must allow black applicants and new employees access to training opportunities on an equal basis with whites in the future. This requirement is implicit in the first paragraph of the district court's decree. It is little more than an echo of Title VII's general prohibition against discrimination in hiring and promoting. Further, if black Bowman employees who are presently locked into racial patterns due to past discrimination are to have a meaningful opportunity to advance, we think they must be afforded special temporary remedial training opportunities. A Tire Shop employee's seniority will be of little use to him in bidding on a mechanic's slot so long as he lacks the necessary skills. As the district court observed, "as a practical matter, nobody in the tire shop can bump a mechanic."

Heretofore Bowman has trained its employees on the job. Inexperienced OTR drivers ride double with experienced drivers. Certain jobs in the Maintenance Department are training steps to the mechanic jobs, and city driver jobs lead to qualification for OTR jobs. On remand the district court should identify those positions which are training grounds, and impose conditions to ensure that a substantial number of Bowman's employees who have been discriminatorily relegated to inferior jobs in the past are afforded a ready access to them. Pettway v. American Cast Iron Pipe Company, supra.

In analogous employment discrimination cases, some courts have ordered the

creation, at company expense, of counselling and training programs to which discriminatees must be admitted in certain numbers each year or according to a fixed ratio until they hold a certain percentage of the skilled positions. *See* Buckner v. Goodyear Tire & Rubber Co., N.D.Ala.1972, 339 F.Supp. 1108, 1124–1125; United States v. Ironworkers Local 86, W.D.Wash.1970, 315 F.Supp. 1202, 1247–1250, aff'd 9th Cir. 1971, 443 F.2d 544, cert. denied 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367. From our appellate prospective, we cannot say that the creation of special new training programs is necessary in this case to afford discriminatees an opportunity to overcome the effects of past discrimination. The inadequacy of existing training methods to accomplish this purpose is not demonstrated in the record. If the district court should find, however, that further remedial measures are necessary to afford adequate training opportunities, it may fashion and grant them.

### 4. Retention of Jurisdiction

■ Bowman maintained blatantly discriminatory policies at least until September of 1971, over five years after the passage of Title VII. Since that time it has moved some distance toward complying with Title VII's mandates, but only under pressure from government agencies and in the face of threatened litigation. These circumstances, as well as the decreasing rate at which it has hired black OTR drivers, necessarily cast some doubt on its intention to discontinue and remedy its unlawful employment practices voluntarily. The district court should retain jurisdiction of this case for at least two years and require periodic reports from Bowman which will enable it to ascertain that the remedial measures it mandates are being carried into effect.

### E. Back Pay

■ The district court denied back pay to the affected classes on the basis of its conclusions that such relief (1) would be inconsistent with the purpose of Title VII to promote conciliation rather than litigation where possible, and (2) would not be "warranted" in a Rule 23(b)(2) class action, which contemplates primarily injunctive and declaratory relief. In addition, the court stated back pay to non-named class members was denied in the exercise of discretion. We do not agree that either Rule 23(b)(2) or Title VII prohibits back pay awards to non-named class members. Further, since it appears that the district court exercised its discretion under an erroneous view of the applicable law, we vacate its decree insofar as it denies back pay to the class and remand for reconsideration of this issue. *Cf.* United States v. Georgia Power Co., 5th Cir. 1973, 474 F.2d 906, 921; Johnson v. Goodyear Tire & Rubber Co., 5th Cir. 1974, 491 F.2d 1364; Pettway v. American Cast Iron Pipe Co., supra.

The remedies authorized in Title VII specifically include back pay. As indicated above, the purpose of Title VII is to make the discriminatee whole and eliminate the effects of past discrimination as far as possible. Where the discriminatee has suffered economic injury in the form of lost wages, back pay is normally appropriate relief. Harkless v. Sweeny Independent School District, 5th Cir. 1970, 427 F.2d 319, 324. The district court recognized this in awarding back pay to Lee. One apparent source of its reluctance to extend this remedy to class members was its view that to do so would allow class members to circumvent EEOC conciliatory efforts and thus frustrate Title VII's policy favoring resolution of problems through conciliation rather than litigation where possible. This view conflicts with what we said in Oatis v. Crown Zellerbach Corp., 5th Cir. 1968, 398 F.2d 496, 499:

Racial discrimination is by definition class discrimination, and to require a multiplicity of separate, identical charges before the EEOC, filed against the same employer, as a pre-

requisite to relief through resort to the court would tend to frustrate our system of justice and order.

*See also* Miller v. International Paper Co., 5th Cir. 1969, 408 F.2d 283, 284–285. An EEOC complaint filed by the class representative allows an adequate opportunity for resolution of problems of the class through conciliation, Bowe v. Colgate-Palmolive Co., 7th Cir. 1969, 416 F.2d 711, 720, and opens the courthouse doors for the class. While *Oatis* and *Miller* did not focus particularly on the back pay relief sought, we see no basis for treating a back pay claim as unique and requiring each class member to file his claim with the EEOC before asserting it in the courtroom. The Seventh Circuit has reached the same conclusion on this issue:

> The clear purpose of Title VII is to bring an end to the proscribed discriminatory practices, and to make whole, in a pecuniary fashion, those who have suffered by it. To permit only injunctive relief in the class action would frustrate the implementation of a strong Congressional purpose expressed in the Civil Rights Act of 1964. To require that each employee file a charge with the EEOC and then join in the suit would have a deleterious effect on the purpose of the Act and impose an unnecessary hurdle to recovery for the wrong inflicted.

Bowe v. Colgate-Palmolive Co., 7th Cir. 1969, 416 F.2d 711, 720. We believe this view is correct, and we hold that neither the letter nor the spirit of Title VII precludes back pay awards to non-named class members when only the class representative has filed an appropriate EEOC complaint.

Nor does Fed.R.Civ.P. 23(b)(2) prohibit back pay awards to non-named class members in a class action under that subdivision of the rule. Pettway v. American Cast Iron Pipe Co., supra; Robinson v. Lorillard Corp., 4th Cir. 1971, 444 F.2d 791, 802, cert. dismissed 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655. It is true that Rule 23(b)(2) re-

fers only to "injunctive relief or corresponding declaratory relief" and "does not extend to cases in which the appropriate final relief relates *exclusively* or *predominantly* to money damages." Advisory Committee's Notes, 1966, 39 F.R. D. 69, 102 (emphasis added). But this Title VII action cannot be characterized as one seeking "exclusively or predominantly money damages." As we have pointed out above, back pay awards under Title VII (and under § 1981 to the extent that a § 1981 corresponds to a Title VII action) are not damages, as such, but an integral part of the equitable remedy. Even if back pay is considered as equivalent to damages under Rule 23, in this case back pay is not the exclusive or predominant remedy sought.

The district court should devise an appropriate procedure for adjudicating the claims of non-named class members for back pay awards. Johnson v. Goodyear Tire & Rubber Co., supra. Reliance on a master may be appropriate. Pettway v. American Cast Iron Pipe Co., supra; *cf.* Robinson v. Lorillard Corp., M.D.N. C.1970, 319 F.Supp. 835, 843, aff'd 4 Cir., 444 F.2d 791, cert. dismissed 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655. Insofar as the district court's judgment denies back pay to non-named class members it is reversed, and this issue is remanded for reconsideration in light of the principles enunciated above.

## IV. Summary

In summary, we hold:

(1) Franks' individual claim was not barred by limitations, and, subject to the district court's determination as to the applicability of laches, the district court should on remand enter judgment in his favor and grant him an appropriate remedy;

(2) the district court's determination of the facts relating to Lee's individual claim was not clearly erroneous;

(3) the class and subclasses represented are entitled to further affirmative relief than was afforded by the district court's decree, including the use of

full company seniority for black Bowman employees who currently remain locked into old racial patterns, public recruitment aimed at potential black OTR drivers and clerical employees, temporary measures to ensure access to training opportunities for discriminatees, and such *Morrow* type affirmative hiring relief as the district court deems appropriate. The district court should retain jurisdiction of this case and require compliance reports from Bowman for at least two years. The district court's denial of back pay to non-named class members is reversed and the issue is remanded for reconsideration in light of this opinion and Johnson v. Goodyear Tire & Rubber Co., supra.

Costs on appeal will be taxed one-tenth against Lee, three-tenths against the union, and six-tenths against Bowman. Appellants' attorneys are entitled to an award for fees earned in the prosecution of this appeal under 42 U.S.C.A. § 2000e–5(k). On remand the district court should determine an appropriate fee award.

The district court's judgment is affirmed in part, reversed in part, vacated in part, and remanded.